# REGENTS OF THE UNIVERSITY OF MICHIGAN v. EWING

No. 84–1273.   Argued October 8, 1985—Decided December 12, 1985

STEVENS, J., delivered the opinion for a unanimous Court.   POWELL, J., filed a concurring opinion, *post*, p. 228.

*Roderick K. Daane* argued the cause for petitioner.   With him on the briefs was *Peter A. Davis*.

*Michael M. Conway* argued the cause for respondent. With him on the brief was *Mary K. Butler.**

JUSTICE STEVENS delivered the opinion of the Court.

Respondent Scott Ewing was dismissed from the University of Michigan after failing an important written examination. The question presented is whether the University's action deprived Ewing of property without due process of law because its refusal to allow him to retake the examination was an arbitrary departure from the University's past practice. The Court of Appeals held that his constitutional rights were violated. We disagree.

I

In the fall of 1975 Ewing enrolled in a special 6-year program of study, known as "Inteflex," offered jointly by the undergraduate college and the Medical School.[1] An undergraduate degree and a medical degree are awarded upon successful completion of the program. In order to qualify for the final two years of the Inteflex program, which consist of clinical training at hospitals affiliated with the University, the student must successfully complete four years of study including both premedical courses and courses in the basic medical sciences. The student must also pass the "NBME

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Acting Solicitor General Wallace, Acting Assistant Attorney General Willard, Deputy Solicitor General Geller, Leonard Schaitman,* and *Freddi Lipstein;* for the American Council on Education et al. by *Eugene D. Gulland, Catherine W. Brown, Sheldon Elliot Steinbach,* and *Joseph Anthony Keyes, Jr.;* for the Curators of the University of Missouri et al. by *Marvin E. Wright* and *William F. Arnet;* and for Duke University et al. by *Robert B. Donin, Daniel Steiner, Eugene J. McDonald, Estelle A. Fishbein, Michael C. Weston,* and *Peter H. Ruger.*

*Michael H. Gottesman, Robert M. Weinberg, Joy L. Koletsky, Laurence Gold,* and *David M. Silberman* filed a brief for the National Education Association et al. as *amici curiae* urging affirmance.

*Anne H. Franke* and *Jacqueline W. Mintz* filed a brief for the American Association of University Professors as *amicus curiae.*

[1] The Inteflex program has since been lengthened to seven years.

Part I"—a 2-day written test administered by the National Board of Medical Examiners.

In the spring of 1981, after overcoming certain academic and personal difficulties, Ewing successfully completed the courses prescribed for the first four years of the Inteflex program and thereby qualified to take the NBME Part I. Ewing failed five of the seven subjects on that examination, receiving a total score of 235 when the passing score was 345. (A score of 380 is required for state licensure and the national mean is 500.) Ewing received the lowest score recorded by an Inteflex student in the brief history of that program.

On July 24, 1981, the Promotion and Review Board individually reviewed the status of several students in the Inteflex program. After considering Ewing's record in some detail, the nine members of the Board in attendance voted unanimously to drop him from registration in the program.

In response to a written request from Ewing, the Board reconvened a week later to reconsider its decision. Ewing appeared personally and explained why he believed that his score on the test did not fairly reflect his academic progress or potential.[2] After reconsidering the matter, the nine voting members present unanimously reaffirmed the prior action to drop Ewing from registration in the program.

In August, Ewing appealed the Board's decision to the Executive Committee of the Medical School. After giving Ewing an opportunity to be heard in person, the Executive Committee unanimously approved a motion to deny his appeal for a leave of absence status that would enable him to retake Part I of the NBME examination. In the following

---

[2] At this and later meetings Ewing excused his NBME Part I failure because his mother had suffered a heart attack 18 months before the examination; his girlfriend broke up with him about six months before the examination; his work on an essay for a contest had taken too much time; his makeup examination in pharmacology was administered just before the NBME Part I; and his inadequate preparation caused him to panic during the examination.

year, Ewing reappeared before the Executive Committee on two separate occasions, each time unsuccessfully seeking readmission to the Medical School. On August 19, 1982, he commenced this litigation in the United States District Court for the Eastern District of Michigan.

II

Ewing's complaint against the Regents of the University of Michigan asserted a right to retake the NBME Part I test on three separate theories, two predicated on state law and one based on federal law.[3] As a matter of state law, he alleged that the University's action constituted a breach of contract and was barred by the doctrine of promissory estoppel. As a matter of federal law, Ewing alleged that he had a property interest in his continued enrollment in the Inteflex program and that his dismissal was arbitrary and capricious, violating his "substantive due process rights" guaranteed by the Fourteenth Amendment and entitling him to relief under 42 U. S. C. § 1983.

The District Court held a 4-day bench trial at which it took evidence on the University's claim that Ewing's dismissal was justified as well as on Ewing's allegation that other University of Michigan medical students who had failed the NBME Part I had routinely been given a second opportunity to take the test. The District Court described Ewing's unfortunate academic history in some detail. Its findings, set forth in the margin,[4] reveal that Ewing "encountered imme-

---

[3] A fourth count of Ewing's complaint advanced a claim for damages under 42 U. S. C. § 1983. The District Court held that the Board of Regents is a state instrumentality immunized from liability for damages under the Eleventh Amendment, and dismissed this count of the complaint. *Ewing* v. *Board of Regents*, 552 F. Supp. 881 (ED Mich. 1982).

[4] "In the fall of 1975, when Ewing enrolled in the program, he encountered immediate difficulty in handling the work and he did not take the final examination in Biology. It was not until the following semester that he completed this course and received a C. His performance in his other first semester courses was as follows: a C in Chemistry 120, a C in his writing course, and an incomplete in the Freshman Seminar. In the next se-

diate difficulty in handling the work," *Ewing* v. *Board of Regents*, 559 F. Supp. 791, 793 (1983), and that his difficulties — in the form of marginally passing grades and a number of

mester he took Chemistry 220, a Freshman Seminar, and Psychology 504. He received a B in the Freshman Seminar, a C in Chemistry 220, but he withdrew from Psychology 504. He was advised at that time that he could not take the Patient Care Course, usually given during the fall of an Inteflex student's second year, and he was placed on an irregular program. Because of these difficulties, at the July 14, 1976 meeting of the Promotion and Review Board he requested a leave of absence, and when this was approved, he left the program.

"During the summer of 1976 while on leave, he took two Physics courses at Point Loma College in California. He reentered the Inteflex program at the University of Michigan in the winter 1977 term. In that term he repeated Chemistry 220 in which he received an A −. In the spring of 1977, he passed the Introduction to the Patient Care course.

"In the 1977–78 year, he completed the regular Year II program. But then he encountered new difficulty. In the fall of 1978 he received an incomplete in Clinical Studies 400, which was converted to a Pass; a B in Microbiology 420; and an incomplete in Gross Anatomy 507. The Gross Anatomy incomplete was converted to a C − by a make-up examination. During the winter of 1979 he received a C − in Genetics 505, a C in Microbiology 520, an E in Microanatomy and General Pathology 506, a B in Creative Writing, and a Pass in Clinical Studies 410. He appealed the Microanatomy and General Pathology grade, requesting a change from an E to a D, and a make-up exam to receive a Pass. His appeal was denied by the Grade Appeal Committee, and he was again placed on an irregular program; he took only the Clinical Studies 420 course in the spring 1979 semester.

"In July 1979, Ewing submitted a request to the Promotion and Review Board for an irregular program consisting of a course in Pharmacology in the fall and winter 1979–80 and a course in Human Illness and Neuroscience in 1980–81, thus splitting the fourth year into two years. The Board denied this request and directed him to take the fourth year curriculum in one academic year. He undertook to do so. He removed his deficiency in Microanatomy and General Pathology 506 by repeating the course during the winter 1980 semester and received a C +. In the spring term of 1980 he passed Developmental Anatomy with a B − grade, and he received a C grade in Neuroscience I 509 after a reexamination. In the fall of 1980, he received a passing grade in Neuroscience 609 and Pharmacology 626, and in the winter term of 1981, he received a passing grade in Clinical Studies

incompletes and makeup examinations, many experienced while Ewing was on a reduced course load—persisted throughout the 6-year period in which he was enrolled in the Inteflex program.

Ewing discounted the importance of his own academic record by offering evidence that other students with even more academic deficiencies were uniformly allowed to retake the NBME Part I. See App. 107–111. The statistical evidence indicated that of the 32 standard students in the Medical School who failed Part I of the NBME since its inception, all 32 were permitted to retake the test, 10 were allowed to take the test a third time, and 1 a fourth time. Seven students in the Inteflex program were allowed to retake the test, and one student was allowed to retake it twice. Ewing is the only student who, having failed the test, was not permitted to retake it. Dr. Robert Reed, a former Director of the Inteflex program and a member of the Promotion and Review Board, stated that students were "routinely" given a second chance. 559 F. Supp., at 794. Accord, App. 8, 30, 39–40, 68, 73, 163. Ewing argued that a promotional pamphlet released by the Medical School approximately a week before the examination had codified this practice. The pamphlet, entitled "On Becoming a Doctor," stated:

> "According to Dr. Gibson, everything possible is done to keep qualified medical students in the Medical School. This even extends to taking and passing National Board Exams. Should a student fail either part of the National Boards, an opportunity is provided to make up the failure in a second exam." *Id.*, at 113.

The District Court concluded that the evidence did not support either Ewing's contract claim or his promissory es-

---

510 and a deficiency in Pharmacology 627. He was given a makeup examination in this course, and he received a 67.7 grade.

"He then took Part I of the NBME . . . ." *Ewing* v. *Board of Regents*, 559 F. Supp., at 793–794.

toppel claim under governing Michigan law. There was "no sufficient evidence to conclude that the defendants bound themselves either expressly or by a course of conduct to give Ewing a second chance to take Part I of the NBME examination." 559 F. Supp., at 800. With reference to the pamphlet "On Becoming A Doctor," the District Court held that "even if [Ewing] had learned of the pamphlet's contents before he took the examination, and I find that he did not, I would not conclude that this amounted either to an unqualified promise to him or gave him a contract right to retake the examination." *Ibid.*

With regard to Ewing's federal claim, the District Court determined that Ewing had a constitutionally protected property interest in his continued enrollment in the Inteflex program and that a state university's academic decisions concerning the qualifications of a medical student are "subject to substantive due process review" in federal court. *Id.,* at 798. The District Court, however, found no violation of Ewing's due process rights. The trial record, it emphasized, was devoid of any indication that the University's decision was "based on bad faith, ill will or other impermissible ulterior motives"; to the contrary, the "evidence demonstrate[d] that the decision to dismiss plaintiff was reached in a fair and impartial manner, and only after careful and deliberate consideration." *Id.,* at 799. To "leave no conjecture" as to his decision, the District Judge expressly found that "the evidence demonstrate[d] no arbitrary or capricious action since [the Regents] had good reason to dismiss Ewing from the program." *Id.,* at 800.

Without reaching the state-law breach-of-contract and promissory-estoppel claims,[5] the Court of Appeals reversed the dismissal of Ewing's federal constitutional claim. The

---

[5] In a footnote, the Court of Appeals stated: "Because we believe this case can be disposed of on the Section 1983 claim, this Court does not expressly reach the breach of contract or promissory estoppel claims." *Ewing* v. *Board of Regents,* 742 F. 2d 913, 914, n. 2 (CA6 1984).

Court of Appeals agreed with the District Court that Ewing's implied contract right to continued enrollment free from arbitrary interference qualified as a property interest protected by the Due Process Clause, but it concluded that the University had arbitrarily deprived him of that property in violation of the Fourteenth Amendment because (1) "Ewing was a 'qualified' student, as the University defined that term, at the time he sat for NBME Part I"; (2) "it was the consistent practice of the University of Michigan to allow a qualified medical student who initially failed the NBME Part I an opportunity for a retest"; and (3) "Ewing was the only University of Michigan medical student who initially failed the NBME Part I between 1975 and 1982, and was not allowed an opportunity for a retest." *Ewing* v. *Board of Regents*, 742 F. 2d 913, 916 (CA6 1984). The Court of Appeals therefore directed the University to allow Ewing to retake the NBME Part I, and if he should pass, to reinstate him in the Inteflex program.

We granted the University's petition for certiorari to consider whether the Court of Appeals had misapplied the doctrine of "substantive due process."[6] 470 U. S. 1083 (1985). We now reverse.

---

[6] The University's petition for certiorari also presented the question whether the Eleventh Amendment constituted a complete bar to the action because it was brought against the "Board of Regents of the University of Michigan," App. 13, a body corporate. Cf. *Florida Dept. of Health* v. *Florida Nursing Home Assn.*, 450 U. S. 147 (1981) *(per curiam)*; *Alabama* v. *Pugh*, 438 U. S. 781 (1978) *(per curiam)*. After the petition was granted, however, respondent Ewing filed a motion to amend the complaint by joining the individual members of the Board of Regents as named defendants in their official capacities. The University did not oppose that motion. Tr. of Oral Arg. 12–13.

Granting the motion merely conforms the pleadings to the "course of proceedings" in the District Court. Cf. *Kentucky* v. *Graham*, 473 U. S. 159, 167, n. 14 (1985); *Brandon* v. *Holt*, 469 U. S. 464, 469 (1985). The record reveals that the Regents frequently referred to themselves in the plural, as "defendants," indicating that they understood the suit to be against them individually, in their official capacities, rather than against

## III

In *Board of Curators, Univ. of Mo.* v. *Horowitz,* 435 U. S. 78, 91–92 (1978), we assumed, without deciding, that federal courts can review an academic decision of a public educational institution under a substantive due process standard. In this case Ewing contends that such review is appropriate because he had a constitutionally protected property interest in his continued enrollment in the Inteflex program.[7] But remembering Justice Brandeis' admonition not to "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied,'" *Ashwander* v. *TVA,* 297 U. S. 288, 347 (1936) (concurring opinion), we again conclude, as we did in *Horowitz,* that the precise facts disclosed by the record afford the most appropriate basis for

---

the Board as a corporate entity. App. 11. Likewise, the District Court held that "defendants did not act in violation of Ewing's due process rights," 559 F. Supp., at 799, and accordingly found "in favor of the defendants," *id.,* at 800. We consequently grant the motion, thereby allowing Ewing to name as defendants the individual members of the Board of Regents in their official capacities. See *Patsy* v. *Florida Board of Regents,* 457 U. S. 496, 516, n. 19 (1982). Given our resolution of the case, we need not consider the question whether the relief sought by Ewing would be available under Eleventh Amendment principles.

[7] Ewing and the courts below reasoned as follows: In *Board of Regents* v. *Roth,* 408 U. S. 564, 577 (1972), this Court held that property interests protected by due process are "defined by existing rules or understandings that stem from an independent source such as state law." See *Goss* v. *Lopez,* 419 U. S. 565, 572–573 (1975). In a companion case, *Perry* v. *Sindermann,* 408 U. S. 593, 601–602 (1972), we held that "agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances'" could be independent sources of property interests. See *Bishop* v. *Wood,* 426 U. S. 341, 344 (1976) (implied contracts). According to an antiquated race discrimination decision of the Michigan Supreme Court (whose principal holding has since been overtaken by events), "when one is admitted to a college, there is an implied understanding that he shall not be arbitrarily dismissed therefrom." *Booker* v. *Grand Rapids Medical College,* 156 Mich. 95, 99–100, 120 N. W. 589, 591 (1909). From the foregoing, Ewing would have us conclude that he had a protectible property interest in continued enrollment in the Inteflex program.

decision. We therefore accept the University's invitation to "assume the existence of a constitutionally protectible property right in [Ewing's] continued enrollment,"[8] and hold that even if Ewing's assumed property interest gave rise to a substantive right under the Due Process Clause to continued enrollment free from arbitrary state action, the facts of record disclose no such action.

As a preliminary matter, it must be noted that any substantive constitutional protection against arbitrary dismissal would not necessarily give Ewing a right to retake the NBME Part I. The constitutionally protected interest alleged by Ewing in his complaint, App. 15, and found by the courts below, derives from Ewing's implied contract right to continued enrollment free from arbitrary dismissal. The District Court did not find that Ewing had any separate right to retake the exam and, what is more, explicitly "reject[ed] the contract and promissory estoppel claims, finding no sufficient evidence to conclude that the defendants bound themselves either expressly or by a course of conduct to give Ewing a second chance to take Part I of the NBME examination." 559 F. Supp., at 800. The Court of Appeals did not overturn the District Court's determination that Ewing lacked a tenable contract or estoppel claim under Michigan law,[9] see *supra*, at 220, and n. 5, and we accept its reason-

---

[8] Tr. of Oral Arg. 3. Consistent with this suggestion, petitioner's answer to Ewing's complaint "admit[ted] that, under Michigan law, [Ewing] may have enjoyed a property right and interest in his continued enrollment in the Inteflex Program." App. 21.

[9] Although there is some ambiguity in its opinion, we understand the Court of Appeals to have found "clearly erroneous" the District Court's rejection of Ewing's federal substantive due process claim solely because of the "undisputed evidence of a consistent pattern of conduct"—namely, the "substantial and uncontroverted evidence in the trial record that at the time Ewing took the NBME Part I, medical students were routinely given a second opportunity to pass it." 742 F. 2d, at 915. The Court of Appeals found no "rule" to the effect that medical students are entitled to retake failed examinations. Indeed, it relied on the University's "promotional

able rendering of state law, particularly when no party has challenged it.[10]

The University's refusal to allow Ewing to retake the NBME Part I is thus not actionable in itself. It is, however, an important element of Ewing's claim that his dismissal was the product of arbitrary state action, for under proper analysis the refusal may constitute evidence of arbitrariness even

---

pamphlet entitled 'On Becoming a Doctor'" only to the extent that it "memorialized the consistent *practice* of the medical school with respect to students who initially fail that examination." *Id.*, at 916 (emphasis added).

A property interest in a second examination, however, cannot be inferred from a consistent practice without some basis in state law. Yet in this case the Court of Appeals did not reverse the District Court's finding that Ewing was not even aware of the contents of the pamphlet and left standing its holding that the statements in this promotional tract did not "amoun[t] either to an unqualified promise to him or . . . a contract right to retake the examination" under state law. 559 F. Supp., at 800. We recognize, of course, that "mutually explicit understandings" may operate to create property interests. *Perry* v. *Sindermann*, 408 U. S., at 601. But such understandings or tacit agreements must support "a legitimate claim of entitlement" under "'an independent source such as state law . . . .'" *Id.*, at 602, n. 7 (quoting *Board of Regents* v. *Roth*, 408 U. S., at 577). The District Court, it bears emphasis, held that the University's liberal retesting custom gave rise to no state-law entitlement to retake the NBME Part I. We rejected an argument similar to Ewing's in *Board of Regents* v. *Roth*. In that case Dr. Roth asserted a property interest in continued employment by virtue of the fact that "of four hundred forty-two non-tenured professors, four were not renewed during [a particular] academic year." Brief for Respondent in *Board of Regents* v. *Roth*, O. T. 1971, No. 71–162, p. 28 (footnote and citation omitted). Absent a state statute or university rule or "anything approaching a 'common law' of re-employment," however, we held that Dr. Roth had no property interest in the renewal of his teaching contract. *Board of Regents* v. *Roth*, 408 U. S., at 578, n. 16.

[10] "In dealing with issues of state law that enter into judgments of federal courts, we are hesitant to overrule decisions by federal courts skilled in the law of particular states unless their conclusions are shown to be unreasonable." *Propper* v. *Clark*, 337 U. S. 472, 486–487 (1949). Accord, *Haring* v. *Prosise*, 462 U. S. 306, 314, n. 8 (1983); *Leroy* v. *Great Western United Corp.*, 443 U. S. 173, 181, n. 11 (1979); *Butner* v. *United States*, 440 U. S. 48, 58 (1979); *Bishop* v. *Wood*, 426 U. S., at 345–347.

if it is not the actual legal wrong alleged. The question, then, is whether the record compels the conclusion that the University acted arbitrarily in dropping Ewing from the Inteflex program without permitting a reexamination.

It is important to remember that this is not a case in which the procedures used by the University were unfair in any respect; quite the contrary is true. Nor can the Regents be accused of concealing nonacademic or constitutionally impermissible reasons for expelling Ewing; the District Court found that the Regents acted in good faith.

Ewing's claim, therefore, must be that the University misjudged his fitness to remain a student in the Inteflex program. The record unmistakably demonstrates, however, that the faculty's decision was made conscientiously and with careful deliberation, based on an evaluation of the entirety of Ewing's academic career. When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment.[11] Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment. Cf. *Youngberg* v. *Romeo*, 457 U. S. 307, 323 (1982).

Considerations of profound importance counsel restrained judicial review of the substance of academic decisions. As JUSTICE WHITE has explained:

"Although the Court regularly proceeds on the assumption that the Due Process Clause has more than a procedural dimension, we must always bear in mind that the substantive content of the Clause is suggested neither by its language nor by preconstitutional history;

---

[11] "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." *Board of Curators, Univ. of Mo.* v. *Horowitz*, 435 U. S. 78, 96, n. 6 (1978) (POWELL, J., concurring). See *id.*, at 90–92 (opinion of the Court).

that content is nothing more than the accumulated product of judicial interpretation of the Fifth and Fourteenth Amendments. This is . . . only to underline Mr. Justice Black's constant reminder to his colleagues that the Court has no license to invalidate legislation which it thinks merely arbitrary or unreasonable." *Moore* v. *East Cleveland,* 431 U. S. 494, 543–544 (1977) (WHITE, J., dissenting).

See *id.,* at 502 (opinion of POWELL, J.). Added to our concern for lack of standards is a reluctance to trench on the prerogatives of state and local educational institutions and our responsibility to safeguard their academic freedom, "a special concern of the First Amendment." *Keyishian* v. *Board of Regents,* 385 U. S. 589, 603 (1967).[12] If a "federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies," *Bishop* v. *Wood,* 426 U. S. 341, 349 (1976), far less is it suited to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions — decisions that require "an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Board of Curators, Univ. of Mo.* v. *Horowitz,* 435 U. S., at 89–90.

---

[12] Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, see *Keyishian* v. *Board of Regents,* 385 U. S., at 603; *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250 (1957) (opinion of Warren, C. J.), but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself, see *University of California Regents* v. *Bakke,* 438 U. S. 265, 312 (1978) (opinion of POWELL, J.); *Sweezy* v. *New Hampshire,* 354 U. S., at 263 (Frankfurter, J., concurring in result). Discretion to determine, on academic grounds, who may be admitted to study, has been described as one of "the four essential freedoms" of a university. *University of California Regents* v. *Bakke,* 438 U. S., at 312 (opinion of POWELL, J.) (quoting *Sweezy* v. *New Hampshire, supra,* at 263 (Frankfurter, J., concurring in result)) (internal quotations omitted).

This narrow avenue for judicial review precludes any conclusion that the decision to dismiss Ewing from the Inteflex program was such a substantial departure from accepted academic norms as to demonstrate that the faculty did not exercise professional judgment. Certainly his expulsion cannot be considered aberrant when viewed in isolation. The District Court found as a fact that the Regents "had good reason to dismiss Ewing from the program." 559 F. Supp., at 800. Before failing the NBME Part I, Ewing accumulated an unenviable academic record characterized by low grades, seven incompletes, and several terms during which he was on an irregular or reduced course load. Ewing's failure of his medical boards, in the words of one of his professors, "merely culminate[d] a series of deficiencies. . . . In many ways, it's the straw that broke the camel's back." App. 79. Accord, *id.*, at 7, 54–55, 72–73.[13] Moreover, the fact that Ewing was "qualified" in the sense that he was eligible to take the examination the first time does not weaken this conclusion, for after Ewing took the NBME Part I it was entirely reasonable for the faculty to reexamine his entire record in the light of the unfortunate results of that examination. Admittedly, it may well have been unwise to deny Ewing a second chance. Permission to retake the test might have saved the University the expense of this litigation and conceivably might have demonstrated that the members of the Promotion and Review Board misjudged Ewing's fitness for the medical profession. But it nevertheless remains true that his dismissal from the Inteflex program rested on an academic judgment that is not beyond

---

[13] Even viewing the case from Ewing's perspective, we cannot say that the explanations and extenuating circumstances he offered were so compelling that their rejection can fairly be described as irrational. For example, the University might well have concluded that Ewing's sensitivity to difficulties in his personal life suggested an inability to handle the stress inherent in a career in medicine. The inordinate amount of time Ewing devoted to his extracurricular essay writing may reasonably have revealed to the University a lack of judgment and an inability to set priorities.

the pale of reasoned academic decisionmaking when viewed against the background of his entire career at the University of Michigan, including his singularly low score on the NBME Part I examination.[14]

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, concurring.

Although I join the Court's opinion holding that respondent presents no violation of the substantive due process right that he asserts, I think it unnecessary to assume the existence of such a right on the facts of this case. Respondent alleges that he had a property interest in his continued enroll-

---

[14] Nor does the University's termination of Ewing substantially deviate from accepted academic norms when compared with its treatment of other students. To be sure, the University routinely gave others an opportunity to retake the NBME Part I. But despite tables recording that some students with more incompletes or low grades were permitted to retake the examination after failing it the first time, App. 105–111, and charts indicating that these students lacked the outside research and honor grade in clinical work that Ewing received, *id.*, at 119–120, we are not in a position to say that these students were "similarly situated" with Ewing. The Promotion and Review Board presumably considered not only the raw statistical data but also the nature and seriousness of the individual deficiencies and their concentration in particular disciplines—in Ewing's case, the hard sciences. The Board was able to take into account the numerous incompletes and makeup examinations Ewing required to secure even marginally passing grades, and it could view them in connection with his reduced course loads. Finally, it was uniquely positioned to observe Ewing's judgment, self-discipline, and ability to handle stress, and was thus especially well situated to make the necessarily subjective judgment of Ewing's prospects for success in the medical profession. The insusceptibility of promotion decisions such as this one to rigorous judicial review is borne out by the fact that 19 other Inteflex students, some with records that a judge might find "better" than Ewing's, were dismissed by the faculty without even being allowed to take the NBME Part I a first time. *Id.*, at 165–166. Cf. *id.*, at 66 (nine Inteflex students terminated after suffering one deficiency and failing one course after warning).

ment in the University's Inteflex program, and that his dismissal was arbitrary and capricious. The dismissal allegedly violated his substantive due process rights guaranteed by the Fourteenth Amendment, providing the basis for his claim under 42 U. S. C. § 1983.

I

As the Court correctly points out, respondent's claim to a property right is dubious at best. *Ante*, at 222, n. 7. Even if one assumes the existence of a property right, however, not every such right is entitled to the protection of substantive due process. While property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, *Board of Regents* v. *Roth*, 408 U. S. 564, 577 (1972), substantive due process rights are created only by the Constitution.

The history of substantive due process "counsels caution and restraint." *Moore* v. *East Cleveland*, 431 U. S. 494, 502 (1977) (opinion of POWELL, J., for a plurality). The determination that a substantive due process right exists is a judgment that "'certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.'" *Ibid.*, quoting *Poe* v. *Ullman*, 367 U. S. 497, 543 (1961) (Harlan, J., dissenting). In the context of liberty interests, this Court has been careful to examine each asserted interest to determine whether it "merits" the protection of substantive due process. See, *e. g.*, *East Cleveland, supra*; *Roe* v. *Wade*, 410 U. S. 113 (1973); *Griswold* v. *Connecticut*, 381 U. S. 479 (1965). "Each new claim to [substantive due process] protection must be considered against a background of Constitutional purposes, as they have been rationally perceived and historically developed." *Poe, supra*, at 544 (Harlan, J., dissenting).

The interest asserted by respondent—an interest in continued enrollment from which he derives a right to retake the NBME—is essentially a state-law contract right. It bears little resemblance to the fundamental interests that previ-

ously have been viewed as implicitly protected by the Constitution. It certainly is not closely tied to "respect for the teachings of history, solid recognition of the basic values that underlie our society, and wise appreciation of the great roles that the doctrines of federalism and separation of powers have played in establishing and preserving American freedoms," *Griswold, supra,* at 501 (Harlan, J., concurring in judgment). For these reasons, briefly summarized, I do not think the fact that Michigan may have labeled this interest "property" entitles it to join those other, far more important interests that have heretofore been accorded the protection of substantive due process. Cf. *Harrah Independent School District* v. *Martin,* 440 U. S. 194 (1979).

## II

I agree fully with the Court's emphasis on the respect and deference that courts should accord academic decisions made by the appropriate university authorities. In view of Ewing's academic record that the Court charitably characterizes as "unfortunate," this is a case that never should have been litigated. After a 4-day trial in a District Court, the case was reviewed by the Court of Appeals for the Sixth Circuit, and now is the subject of a decision of the United States Supreme Court. Judicial review of academic decisions, including those with respect to the admission or dismissal of students, is rarely appropriate, particularly where orderly administrative procedures are followed—as in this case.*

---

*See *Board of Curators, Univ. of Mo.* v. *Horowitz,* 435 U. S. 78, 96, n. 6 (1978) (opinion of POWELL, J.), cited *ante,* at 225, n. 11. See also *University of California Regents* v. *Bakke,* 438 U. S. 265, 312 (1978) (opinion of POWELL, J.) ("Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment"); *Keyishian* v. *Board of Regents,* 385 U. S. 589, 603 (1967).