ARMSTRONG

v.

WRIGHT STATE UNIVERSITY.

Court of Claims of Ohio.

No. 98–05065.

Decided Oct. 28, 1999.

*Thomas J. Replogle,* for plaintiff.

*Betty D. Montgomery,* Attorney General, and *Randall W. Knutti,* Assistant Attorney General, for defendant.

---

RUSSELL LEACH, Judge.

This matter was tried before the court on the sole issue of liability. Plaintiff Tim Armstrong's cause of action arose as a result of his termination from a residency program at defendant's School of Professional Psychology. Plaintiff alleges that defendant breached its contract with him and terminated him from the program in a retaliatory manner. Defendant denies any liability. The findings and conclusions herein are derived from the documents and pleadings contained in the case file, the evidence introduced at trial, and the presentations made by the parties. The court finds that the following facts were proven by a preponderance of the evidence.

Plaintiff was a student at the Chicago School of Psychology ("CSP") in the fall of 1996. Plaintiff enrolled in defendant's residency program in order to complete the necessary requirements to obtain a license in psychology from CSP. Plaintiff began his residency on September 1, 1996. On June 9, 1997, plaintiff was terminated from the residency program. Plaintiff alleges that he was terminated in retaliation for a case presentation he made on April 16, 1997, and that defendant failed to follow the university's guidelines for terminating his residency. Plaintiff also alleges that he was not afforded due process during the hearing where it was determined that he would be terminated from the program.

Defendant maintains that plaintiff was discharged for academic reasons. Defendant contends that plaintiff displayed a pattern of behavior throughout his residency, wherein he would intentionally not inform his supervisors of his work and would act without the authority or approval of a supervising psychologist.

Defendant's psychology residency programs consist of either two six-month rotations, or one twelve-month rotation, after which an intern receives a passing or failing evaluation. Had plaintiff passed his residency, he would have obtained his degree in psychology from CSP.

During plaintiff's residency, he was under the direction of Dr. Robert Friedberg, co-director of the Residency Training Program. In addition, plaintiff was supervised by three different faculty members. Dr. John Stewart was plaintiff's first supervisor at the Dayton Mental Health Center ("DMHC"). Dr. Stewart supervised plaintiff from approximately September 1 to November 25, 1996. Dr. Stewart requested that plaintiff obtain a different supervisor in November 1996 because he was concerned that plaintiff was not keeping him apprised of his work. Specifically, Dr. Stewart indicated that plaintiff (1) had poor diagnostic skills and abilities and failed to recognize these deficiencies, (2) gave negative responses to feedback during clinical supervision, and (3) failed to keep him informed about his work. During a residency, the resident works under the license of the supervisor. Dr. Stewart felt that since plaintiff was not informing him of his work, he did not want to be held responsible for plaintiff's actions.

Dr. Ray Crosby agreed to supervise plaintiff beginning on November 25, 1996, under a more restrictive curriculum. Plaintiff passed his first rotation with Dr. Crosby on approximately February 28, 1997. However, at the conclusion of his rotation, Dr. Friedberg stated in a letter accompanying plaintiff's mid-year progress report that plaintiff's performance was marginal and that he thought plaintiff needed an even more restrictive plan to continue successfully in the residency program.

Plaintiff was supervised in his second six-month rotation by Dr. Nancy Schindler at the Center for Psychological Services (a.k.a. the White Center). Drs. Schindler and Friedberg agreed to have weekly or biweekly telephone conferences regarding plaintiff's rotation in order to monitor his progress. Plaintiff was notified that he would be more closely supervised and that "continuation or re-emergence of plaintiff's impulsive style regarding assessments, difficulty keeping supervisors informed about his activities and apparent difficulty responding to supervisory feedback would be cause for reevaluation of his intern status and may jeopardize his continued participation in the training program."

All of the residents were required to present five cases during their residency. On April 16, 1997, plaintiff gave his fifth presentation. Plaintiff had prepared a case and had discussed his presentation topic with Dr. Schindler a few days prior to the presentation. However, on the day before the scheduled presentation, plaintiff learned of an interesting case of a student who had been treated at the White Center. Although plaintiff was not assigned to the treatment of this patient, he had previously had some contact with him. The patient was a student in crisis who had made threatening remarks to other students and to Jen McIver, the psychology intern who had interviewed him. The patient presented a danger to himself and others. A treatment plan was implemented by Dr. Mary Talen and Jen McIver. Plaintiff asserts that he watched the videotaped interview of

the patient and asked Dr. Talen if he could present the case. Plaintiff asserts that Dr. Talen granted him permission. Dr. Talen testified that while she did not explicitly prohibit plaintiff from presenting the case, she had implied to him that he should not present it. She testified that it is common knowledge that the subject of case presentations should be the cases to which the residents are assigned. Because plaintiff was not assigned to the case, he should not have presented it.

On April 16, 1997, plaintiff presented the case regarding the patient in crisis, rather than the presentation that he had prepared and had been approved by Dr. Schindler. During the presentation, which received the highest evaluation score possible by the other residents, some listeners, including Dr. Kathy Malloy, formed the belief that the appropriate security measures had not been taken and that a treatment plan was not in place for the patient. Although plaintiff asserts that he presented the case as a hypothetical situation, many people in attendance believed that it was an actual case at the White Center. Plaintiff's omission that security was called led Dr. Malloy to become alarmed. Dr. Malloy spoke to plaintiff after the presentation and requested that he either call Dr. Schindler or Dr. Talen to present his concerns about security. Plaintiff informed Dr. Malloy that he did not feel comfortable calling Dr. Schindler because of his strained relationship with her and that he also did not feel comfortable consulting Dr. Talen. Dr. Malloy then called Dr. Schindler and asked what was going on with the treatment of the patient. Dr. Schindler informed Dr. Malloy that the appropriate security precautions had been taken and was surprised that plaintiff had not explicitly informed the group of that fact. Dr. Schindler was very alarmed that plaintiff had even presented the case, since he was not assigned to it, and because it was not a case under Dr. Schindler's supervision.

On May 30, 1997, Drs. Friedberg and Malloy, co-directors of the Residency Training Program, held a meeting wherein it was determined that plaintiff should be terminated from the program. Plaintiff appealed the decision to the panel, which subsequently upheld the decision for termination. Plaintiff appealed to the president of the university, but he also upheld the panel's decision. Plaintiff exhausted all of his administrative remedies before bringing this action.

Although plaintiff maintains that he was terminated from the program as a result of his case presentation, the court finds that the presentation was not the sole reason for plaintiff's termination. The records of plaintiff's participation in the residency program delineate three problem areas plaintiff continuously presented throughout the program: (1) personal functioning, (2) professional skill competency, and (3) professional standards and behavior.

A trial court is required to defer to academic decisions of a college unless it perceives " 'such a substantial departure from accepted academic norms

as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'" *Bleicher v. Univ. of Cincinnati College of Medicine* (1992), 78 Ohio App.3d 302, 308, 604 N.E.2d 783, 788, quoting *Regents of the Univ. of Michigan v. Ewing* (1985), 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523, 532. The standard of review is not merely whether the court would have decided the matter differently but whether the faculty action was arbitrary and capricious. *Bleicher, supra.* See *Bd. of Curators of Univ. of Missouri v. Horowitz* (1978), 435 U.S. 78, 91, 98 S.Ct. 948, 955–956, 55 L.Ed.2d 124, 135–136.

The documents produced at trial demonstrate that even after several meetings with his supervisors, plaintiff continued to display poor diagnostic skills, negative response to criticism, and, most significantly, a failure to inform his supervisors of the work that he was conducting. In fact, plaintiff presented these same problems after he had gone through three different supervisors. The court finds that plaintiff's termination from defendant's program was not solely based upon his case presentation but, rather, plaintiff's substandard performance throughout the entire program.

Although plaintiff asserts that he was not afforded due process at the termination hearing, the court finds that he was represented by counsel at the hearing and that defendant substantially complied with the regulations regarding the procedures of the meeting.

Based upon the evidence presented at trial and the findings in *Bleicher, supra,* the court concludes that plaintiff has failed to prove by a preponderance of the evidence that defendant's decision to terminate him from the psychology residency program was arbitrary or capricious. Judgment shall be rendered in favor of defendant.

*Judgment for defendant.*

RUSSELL LEACH, J., retired, of the Franklin County Municipal Court, sitting by assignment.