IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 3, 1998 Session

# PARKS PROPERTIES, ET AL. v. MAURY COUNTY, ET AL.

**Appeal from the Circuit Court for Maury County**
**No. 6707     William B. Cain, Judge**

---

**No. M1997-00235-COA-R3-CV - Filed September 20, 2001**

---

### OPINION DENYING PETITION FOR REHEARING

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which HENRY F. TODD, P.J., M.S., and JERRY SMITH, J., joined.

Parks Properties and Columbia Warehouses, Inc. have filed a petition pursuant to Tenn. R. App. P. 39 requesting a rehearing of this court's August, 17, 2001 opinion. We requested and have now received an answer to this petition on behalf of Maury County and Judy Langsdon.

Parks Properties and Columbia Warehouses insist that our conclusion that they lacked a protectable property interest in constructing the two warehouses without installing the automatic required sprinkler systems is based on our "misunderstanding that the warehouses would have contained tobacco or other combustible products." They assert that "there was never any evidence before the trial court that the warehouses would be used to store tobacco or other combustible products." This argument misses the point. The lynchpin of our opinion is that the record contains no evidence (1) that the Parks family ever told any county official that tobacco and other combustible materials would not be stored in these warehouses and (2) that the Parks family never sought a waiver of the automatic sprinkler requirements under Section 402.4.1 exception 2.

## I.

Steve Parks and his father, Joe Houston Parks, operate the Columbia Tobacco Warehouse, one of the two federally-approved tobacco warehouses in the area when this dispute arose.[1] Their income from operating the tobacco warehouse was directly related to the amount of time they were allowed to sell tobacco during the selling season.[2] Their allocated selling time was, in turn, directly

---

[1] After this dispute arose, the Parkses joined forces with their only remaining competitor and now own and control eighty percent of the tobacco warehouse space in the area.

[2] According to Steve Parks, the selling season consisted of November, December, and the first half of January.

related to the amount of federally-approved warehouse space they had "available" to sell tobacco. Thus, the more approved warehouse space the Columbia Tobacco Warehouse had "available," the larger its share of the selling time would be.

Some time in early 1994, Steve Parks discovered that two large metal buildings on the "Weather Tamer" property were going to be torn down to make way for a new automobile dealership. He decided that purchasing these buildings would be, in his words, a "racehorse deal" for his family. Buying these buildings and erecting them on land his family already owned would generate additional income in three ways. First, these buildings would increase the warehouse space "available" to sell tobacco and would thereby increase the amount of the Parkses' selling time during the 1994 tobacco season.[3] Second, Mr. Parks anticipated income from the sale of the unused portions of the metal buildings as scrap. Third, Mr. Parks anticipated that the family could receive income by renting the warehouses following the 1994 tobacco season.

Mr. Parks's primary interest in purchasing these buildings was the prospect that they could be used to increase the amount of selling time allocated to the Columbia Tobacco Warehouse during the 1994 season. He understood that the buildings would not have this effect unless he was able to disassemble them, erect them on his family's property, and have them inspected and approved by the federal government before the tobacco selling season began in November.[4] Accordingly, he determined that erection of these warehouses on his family's property must commence by August at the latest.

Mr. Parks and his father decided to build these warehouses on family property that had already been enhanced by the construction of a bridge and road improvements paid for by the state and county governments. They knew that the largest remaining obstacle to developing the property was the lack of an adequate water supply. In fact, the inadequate water supply could complicate rezoning the property to an M-1 (light industrial) classification[5] and could also impair their ability to comply with applicable fire safety codes. They also knew that they did not intend to incur the expense of running an adequate water supply to the property. Accordingly, in April 1994, Mr. Parks and his father met with Ms. Langsdon to discuss how they could solve their water problem.

In Ms. Langsdon, Mr. Parks and his father picked the right local official to talk to. In addition to being the local building official charged with the enforcement of the Standard Building Code, she served as the staff to the Maury County Regional Planning Commission. The commission

---

[3]Mr. Parks and his father desired to increase their selling time because they expected a large tobacco crop in 1994 and because they expected to lure tobacco farmers away from their competitor.

[4]As we understand the testimony, Mr. Parks would not have been able to count this warehouse space as "available" for selling tobacco unless the federal government approved the lighting and floors in the warehouses.

[5]According to Section 5.061a of the zoning regulations, each building in an area zoned M-1 "having the potential capacity for occupancy by (10) or more persons shall be adequately protected from fire. This protection may be in the form of either internal protective systems, such as sprinklers, fire walls, etc., or water service adequate to meet fire flow requirements as established in the latest edition of the Guide for Determination of Required Fire Flow, published by the insurance services office."

was required to make recommendations to the Maury County Commission regarding all zoning classification changes, and the county commission placed great weight on the recommendations of the planning commission.

As a result of their conversations with Ms. Langsdon, Mr. Parks and his father reluctantly agreed that no more than five persons would occupy each of the buildings in order to avoid any obstacle that the lack of water might be to their rezoning request.[6] They neither proposed nor agreed to any other restriction on the future use of the warehouses. Ms. Langsdon had the discretion to waive the automatic sprinkler requirement for certain one-story buildings "where noncombustible products are manufactured or stored."[7] However, there is no evidence in this record that Mr. Parks ever requested Ms. Langsdon to grant a waiver under this exception or that he ever formally agreed with any responsible county official to restrict the items that could permissibly be stored in the buildings. In fact, all the evidence in the record points in the other direction.

Mr. Parks testified that he never told Ms. Langsdon that he and his father intended to store tobacco or other combustible materials in the buildings. True enough. However, neither he, nor his father, nor any of the other members of his family ever testified that they told Ms. Langsdon, or any other county official for that matter, what they intended to use the warehouses for. Ms. Langsdon's testimony that Mr. Parks was "nebulous" about the future use of the buildings is substantiated by the working description of the development throughout the proceedings. Both the Parks family and the local officials consistently described the development as a "general warehousing, wholesaling, and storage business." On at least one occasion, a surveyor employed by the Parks family described the warehouses as "spec" buildings, and, even at trial, the Parkses' lawyer referred to these warehouses as "spec" buildings.[8]

The trial court never found that the Parks family asked Ms. Langsdon for an exception under Section 402.4.1 exception 2. Rather, the trial court found that the Parks family were seeking approval to substitute a performance bond for the required automatic sprinkler system based on their promise to install the required sprinkler system as soon as the property had an adequate water supply.

---

[6] Section 5.061a required adequate fire safety protection for all buildings having the potential for occupancy of ten or more persons. Even though buildings of the size that Mr. Parks was planning to build could have an expected occupancy of between fifty and one hundred persons, Mr. Parks agreed to the drastic occupancy restriction to assure a favorable zoning recommendation from the Maury County Regional Planning Commission. Fire safety was an issue during the re-zoning process because two local officials had recommended against rezoning the property because the water available at the site would not provide adequate fire protection.

[7] Standard Bldg. Code § 402.4.1 exception 2 gives the local building official the discretionary power to waive the required sprinkler systems for "occupancies where noncombustible products are manufactured or stored, such as metal processing and manufacturing plants, and metal products are not stored in combustible wrappings, containers, or palletized."

[8] For example, in his opening argument, the Parkses' lawyer explained that "[t]he proof will show that at that meeting [the initial meeting with Ms. Langsdon in April 1998] Joe Parks and Steve Parks were there. They went into Ms. Langsdon, told them their plans: They would like to buy these two buildings and move them on the Parks' property located on the bypass and reconstruct them as 'spec' warehouses." Others explained at trial that a "spec" building was one that was constructed with no particular tenant or use in mind.

We agree with the trial court's characterization of the Parks family's proposal. We also conclude that this proposal is entirely inconsistent with a pure request for a waiver of the sprinkler requirement under Section 402.4.1 exception 2. Had the Parks family been proceeding under that exception, there would never have been a future need for sprinklers or for a bond.

The evidence suggests at least two reasons why Mr. Parks and his father did not seek a waiver of the sprinkler requirement pursuant to Section 402.4.1 exception 2. To get such a waiver, they would have been required to agree to restrict all future use of the buildings to "occupancies where noncombustible products are manufactured or stored." Had they agreed to that restriction, they would not have been able to represent that these warehouses were "available" for the sale or storage of tobacco because tobacco is extremely combustible.[9] Thus, obtaining an exception under Section 402.4.1 exception 2 would have jeopardized their efforts to increase their selling time during 1994. Second, use restrictions on the buildings, when coupled with the severe occupancy restrictions that the Parks family had already agreed to, would have further undermined the attractiveness of this space as rental property following the 1994 tobacco season.

## II.

In summary, we agree that there is no evidence in the record that the Parks family told Ms. Langsdon that they planned to store tobacco or other combustible materials in these buildings. However, the absence of this evidence has no bearing on whether the Parks family proved that Ms. Langsdon infringed upon their property interest protectable by substantive due process. They did not seek from Ms. Langsdon a Section 402.4.1 exception 2 waiver of the automatic sprinkler requirement. Instead, they wanted to temporarily bond off the automatic sprinkler requirements without any restriction on the use of the buildings. While Ms. Langsdon may have had discretion to grant the former, she had no authority under the Standard Building Code to grant the latter. Accordingly, we re-affirm our conclusion that the Section 1983 claims of Parks Properties and Columbia Warehouses, Inc. must be dismissed because they failed to prove that they had a protectable property interest in constructing the warehouses without automatic sprinklers.

_____
WILLIAM C. KOCH, JR., JUDGE

---

[9] On this point, the fact that Mr. Parks and his father did not "intend" to store tobacco in these warehouses is irrelevant. What is relevant is that Mr. Parks and his father intended that these warehouses would be "available." They could not have truthfully held out these warehouses as "available" for tobacco if combustible items could not legally be stored in them.