[Cite as *Mlakar v. Miami Univ.*, 2013-Ohio-5930.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

CHARLES SHAY MLAKAR, et al.

     Plaintiffs

     v.

MIAMI UNIVERSITY

     Defendant

Case No. 2012-01791

Magistrate Holly True Shaver

DECISION OF THE MAGISTRATE

{¶ 1} Plaintiffs brought this action alleging breach of contract. The case proceeded to trial on the issues of both liability and damages.

{¶ 2} On May 3, 2010, plaintiffs, Charles Shay Mlakar and Jordan Curtis, were first-year undergraduate students at defendant university. Plaintiffs were enrolled in a year-long chemistry course taught by Dr. Richard Bretz. Approximately 150 to 200 students sat for the final exam, during which they were advised to sit with one empty chair separating them from the next student. The classroom was comprised of 10 to 15 tiered rows. The desks in the classroom consisted of long tables and the seating consisted of chairs that had casters on them. Plaintiffs sat next to each other, with one empty seat between them. When a stack of exams was passed down their row, Curtis took the exam from the top of the stack and then passed the stack to Mlakar.

{¶ 3} According to plaintiffs, another stray exam was passed down the row. Instead of taking the next exam off the top of the stack, Mlakar took the stray exam and passed the stack to the next student, Elizabeth Pavlik. Plaintiffs completed their exams within the alloted time and turned them in.

{¶ 4} On May 5, 2010, Dr. Bretz sent an email to Dr. Chris Makaroff, Dean of the Department of Chemistry and Biochemistry, wherein Dr. Bretz stated that he had witnessed "suspicious activity between three students" (including plaintiffs and another student) during the final exam. Dr. Bretz informed Dr. Makaroff that he witnessed students looking at each other's Scantron cards, sliding their chairs together, and switching forms of the exam. (Plaintiffs' Exhibit 2.) Later the same day, Dr. Makaroff notified plaintiffs via email that they had been charged with academic dishonesty as a result of the chemistry final exam. In the notice, Dr. Makaroff attached a copy of the student handbook; advised plaintiffs that if they had questions they could schedule a meeting with him prior to the hearing and that their academic advisor could attend; stated that they must schedule a hearing on the merits of the allegations and that a member of the university community could accompany them; advised them that if they felt that he could not be impartial or fair that a designee could conduct the hearing; informed them that they could submit a written statement prior to or during the hearing, that they could bring any witnesses that they wanted, and informed them of the post-hearing process. (Plaintiffs' Exhibit 1.) Dr. Makaroff advised plaintiffs that "[w]ithin 7 days of the receipt of this memo you must schedule a meeting with me to hear the academic dishonesty case." *Id.*

{¶ 5} On May 7, 2010, Dr. Makaroff conducted separate academic dishonesty hearings for the three accused students. On May 11, 2010, plaintiffs were notified that Dr. Makaroff had found them "responsible" for an act of academic dishonesty for "communicating with, providing assistance to, or receiving assistance from another person in a manor [sic] not authorized by the instructor" during the final exam in Chemistry 142 on May 3, 2010. (Plaintiffs' Exhibit 5.) Dr. Makaroff advised plaintiffs that they had the right to appeal his decision as outlined in the student handbook by submitting a written appeal to Dean Karen Schilling within five class days of the notice, or by 5:00 p.m. Monday, May 17, 2010. *Id.*

{¶ 6} Plaintiffs both submitted timely written appeals to Dean Schilling.  On May 18, 2010, Dean Schilling notified plaintiffs that she had sustained Dr. Makaroff's original finding of academic dishonesty.  (Plaintiffs' Exhibit 8.)  On June 11, 2010, Dean Schilling met with plaintiffs at their request.  On June 17, 2010, Dean Schilling sent plaintiffs written notification that she would not reverse her decision.  (Plaintiffs' Exhibit 11.)  As a result of the finding of academic dishonesty, plaintiffs received a grade of "zero" on the final examination and were required to complete a seminar on academic integrity at a cost of $200.  Plaintiffs dispute the finding of academic dishonesty and assert that defendant both breached its contract with them and denied them due process when it failed to comply with the procedures in its university student handbook.

{¶ 7} It is well-settled that the relationship between a university and a student who enrolls, pays tuition, and attends class is contractual in nature, and that the terms of this contractual relationship may be found in the handbook, catalog, and other guidelines supplied to students.  *Bleicher v. Univ. of Cincinnati College of Med.*, 78 Ohio App.3d 302, 308 (10th Dist.1992).  In addressing an alleged breach of such contract, a trial court is required to defer to academic decisions of a university unless it perceives "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.*, quoting *Regents of the Univ. of Michigan v. Ewing,* 474 U.S. 214, 225 (1985).  The standard of review is not merely whether the court would have decided the matter differently but whether the faculty action was arbitrary and capricious.  *Bleicher, supra. See Bd. of Curators of Univ. of Mo. v. Horowitz,* 435 U.S. 78, 91 (1978)*.*

{¶ 8} Mlakar testified that he was not aware that he and Curtis had the same version of the exam until they discussed the exam later in the evening on May 3. Mlakar and Curtis both testified that the exams were printed on white paper, and that there was no way to determine which version was being distributed until the exam was opened and the words "form 1" or "form 2" appeared.  Mlakar and Curtis also testified that cell phones were not permitted in the classroom during the exam and that the only

clock in the classroom was located on the back wall, so that they had to turn around in their chairs multiple times throughout the exam to see the clock.

{¶ 9} With regard to the hearing procedure, Mlakar testified that the student handbook mandates that the hearing on academic dishonesty be no earlier than seven class days after the notice of the hearing, but that Dr. Makaroff conducted the hearing only two days after the notice was sent, on a day when he had his last final exam of the semester. Mlakar stated that his hearing lasted less than 10 minutes, and although he took a statement from Pavlik to the hearing, Dr. Makaroff did not ask him any questions about Pavlik's statement. Mlakar also testified that Dr. Bretz alleged that he saw Curtis and Mlakar looking at each other's exams, and that he was informed that Curtis and he had 64 out of 70 identical answers on the exam. Mlakar conceded that he did not raise the issues of having inadequate time to prepare for his hearing or the premature scheduling of his hearing in his appeal to Dr. Schilling.

{¶ 10} Curtis testified that the final exam was printed on white paper but that the tests throughout the chemistry course had been printed on colored paper. Curtis stated that she was often "fidgety" during exams to explain why she moved in her chair during the exam. Curtis also testified that she and Mlakar realized that they had the same version of the exam later that night when they were discussing the exam but that they did not realize that they had the same version while they were taking the exam.

{¶ 11} With regard to her hearing, Curtis testified that she gave Pavlik's statement to Dr. Makaroff, but she felt that he had already concluded that she had cheated, and that she did not have a chance to explain anything during the hearing. Curtis acknowledged that she did not state in her letter of appeal that she did not have enough time to prepare for the hearing or that the scheduling of the hearing did not comply with the student handbook requirements.

{¶ 12} Dr. Bretz testified that the final exam he used for the first-year chemistry class is a standardized test issued by the American Chemical Society (ACS). According

to Dr. Bretz, the ACS exam is sold in two versions, on two different colors of paper.  Dr. Bretz stated that the exam that he used in 2010 had both a gray and a yellow version.  Dr. Bretz explained that aside from the difference in color, the order of the questions and the order of the four possible multiple choice answers are unique to each version.  Dr. Bretz had organized the exams into stacks prior to distributing them so that students would receive alternate copies of the exam.  When Dr. Bretz distributed the exams he passed a stack of exams down the row and told the students to take an exam from the top of the stack.  Inasmuch as the two versions of the exam are different colors, by scanning the classroom Dr. Bretz could ascertain if someone had an exam out of order.  Half-way through the exam, Dr. Bretz realized that both plaintiffs had the yellow version of the exam.  According to Dr. Bretz, it was not acceptable for two students sitting beside one another to have the same version of the exam.  The other accused student who was sitting behind Mlakar also had the yellow version of the exam, which was the correct version for that student to have.

{¶ 13} Dr. Bretz testified that he witnessed eye movement between plaintiffs towards their Scantron answer sheets during the exam.  After the exams were graded through the Scantron machine, Dr. Bretz learned that out of 70 questions, Curtis and Mlakar had 64 identical answers.  Of those 64 answers, 18 were wrong answers.  Of those 18 identical wrong answers, eight were not the most commonly given wrong answer.  Dr. Bretz stated that he would not recommend charges of academic dishonesty casually against any student, but what he witnessed during the exam, combined with the statistical analysis of the number of identical answers between plaintiffs convinced him to contact Dr. Makaroff.

{¶ 14} Dr. Makaroff testified that during his nine years as the chair of the chemistry department, he has conducted approximately 50 academic misconduct hearings.  Dr. Makaroff testified that when an instructor suspects academic misconduct, he would review the instructor's evidence and decide whether a hearing is warranted.  If

so, a letter is sent to the accused student to set a hearing time. In this matter, Dr. Makaroff advised Dr. Bretz to proceed with formal charges.

{¶ 15} According to Dr. Makaroff, he initially explains the hearing process and asks the student whether he has any questions. Then the faculty member presents his evidence, and the student is permitted to present his side of the story. Dr. Makaroff stated that plaintiffs were each permitted to talk as much as they wished during their separate hearings. Dr. Makaroff stated that he also did an independent review of the Scantron cards and answer key to make sure that Dr. Bretz's analysis of the number of identical answers attributed to plaintiffs was accurate. After plaintiffs' hearings, Dr. Makaroff went to the classroom to observe where plaintiffs and the other accused student had been sitting during the exam. After evaluating all of the evidence, including Pavlik's written statement, the Scantron sheets, the exams, and any written statements submitted to him from plaintiffs, Dr. Makaroff decided plaintiffs were responsible for academic dishonesty. Dr. Makaroff added that he gives students the benefit of the doubt, and only where the evidence is overwhelming does he find them responsible.

{¶ 16} Dr. Makaroff explained that in order to purchase the ACS exams the university completes a form promising to hold the exams in confidence and in a secure location; and that a secretary in the chemistry department stores them in a safe, takes an inventory of the exams, distributes them to the chemistry professors, and then collects the exams and returns them to the safe for reuse the following year. Dr. Makaroff testified that the ACS exams are always issued in two different colors; that all faculty are required to administer the same exam; and that the ACS exams that were used in Dr. Bretz's class in 2010 were either yellow or gray. Dr. Makaroff presented examples of the exams used in 2010. (Defendant's Exhibits I and J.)

{¶ 17} Plaintiffs assert that the language in Dr. Makaroff's May 5, 2010 memo conflicts with the student handbook. Dr. Makaroff's memo states, in part:

{¶ 18} "Within 7 days of the receipt of this memo you must schedule a meeting with me to hear the academic dishonesty case.  Given that we are near the end of the term, we are able to schedule this meeting as soon as possible.  The date and time must be set so that you, Dr. Bretz, and I can be present.  Please contact Katie Peyton (513-529-2813) to set up the meeting.  According to University Regulations, if you wish, you may be accompanied by a member of the University community."  (Plaintiffs' Exhibit 1.)

{¶ 19} Section 1.5.C.2 of the student handbook states:  "Procedures for notifying accused student(s).  The department chair/program director shall notify the accused student in writing of the charge of academic dishonesty and will schedule a hearing with the accused student.  The department chair/program director will notify the student, via the student's University electronic mail address, of the hearing no fewer than seven class days prior to the hearing.  *(Note:  any reference to class days in this manual includes final exam week.)*" (Emphasis in original.)

{¶ 20} Plaintiffs contend that inasmuch as their hearings were scheduled two days after they received notice of the allegations against them, defendant violated the student handbook.  Defendant argued that Dr. Makaroff's memo stated that plaintiffs were required to "schedule" a meeting within seven days of the receipt of the memo, not that the meeting had to be "conducted" within seven days of receipt of the memo.  The handbook states that the accused student must be notified of the hearing no fewer than seven class days prior to the hearing.  However, Dr. Makaroff testified that his practice is to have the students call his secretary to schedule the hearing at their convenience instead of unilaterally choosing a hearing date seven class days from the date of his notification.  While defendant may have technically violated the student handbook, the court finds that defendant substantially complied with its requirements.

{¶ 21} Section 1.5.D of the manual states, in part:  "1.  Appeals may be made on three grounds:  (1) inappropriate sanction, (2) procedural defects, either or both of which were sufficiently substantial to have affected the outcome of the case, or (3) new

evidence." Although at trial plaintiffs testified that they did not feel like they had adequate time to prepare for the hearing, neither of them raised that procedural defect in their appeal to Dean Schilling.

{¶ 22} Upon review, the court finds that plaintiffs have failed to prove by a preponderance of the evidence that defendant did not actually exercise professional judgment. Indeed, Dr. Bretz testified credibly that he witnessed plaintiffs looking at each other's exams and that they both had the same version of the exam despite the fact that Mlakar should have had a different version. In addition, the number of identical answers was never disputed.

{¶ 23} Furthermore, the court finds that the testimony of Drs. Bretz and Makaroff was more credible than that of plaintiffs with regard to the color of the examinations. The court is persuaded that the final exam was produced by ACS, that it was produced in two different versions in two different colors, and that plaintiffs' contention that they were not aware that they both had the same version of the exam until later in the evening was not credible.

{¶ 24} Lastly, to the extent that plaintiffs assert that defendant violated their rights to due process, it is well-settled that constitutional claims are not actionable in the Court of Claims. *See Thompson v. S. State Community College,* 10th Dist. No. 89AP-114 (June 15, 1989); *Burkey v. S. Ohio Corr. Facility*, 38 Ohio App.3d 170 (10th Dist.1988). Accordingly, the court finds that it lacks jurisdiction over plaintiffs' due process claims.

{¶ 25} For the foregoing reasons, the court finds that plaintiffs have failed to prove any of their claims by a preponderance of the evidence and, accordingly, judgment is recommended in favor of defendant.

{¶ 26} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first*

*objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
HOLLY TRUE SHAVER
Magistrate

cc:

Jack Cornett
1400 Eaton Avenue
Hamilton, Ohio 45013

Randall W. Knutti
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

002
Filed July 11, 2013
Sent to S.C. Reporter April 30, 2014