In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 17-3351

JENNIFER DIPERNA,

*Plaintiff-Appellant,*

*v.*

THE CHICAGO SCHOOL OF
PROFESSIONAL PSYCHOLOGY,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-00057 — **John Z. Lee**, *Judge.*

---

ARGUED APRIL 19, 2018 — DECIDED JUNE 26, 2018

---

Before RIPPLE, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* Jennifer DiPerna was a student pursuing a master's degree in clinical psychology at The Chicago School of Professional Psychology (TCSPP), a private, non-profit institution. After TCSPP disciplined DiPerna for posting an image to her personal Instagram account that TCSPP considered offensive, DiPerna filed this lawsuit alleging breach of contract and negligence.

The year after DiPerna filed her complaint, one of her professors accused her of plagiarism. A hearing was held before a school committee, and DiPerna was dismissed. She amended her complaint to include claims related to her dismissal.

In the proceedings below, DiPerna voluntarily withdrew some of her claims, and the district court granted summary judgment to TCSPP on all the others. DiPerna now challenges the district court's conclusions. We affirm.

### I.

**A. Background**

DiPerna's issues with TCSPP began in the spring of 2013. That semester, DiPerna enrolled in a course titled "Diversity in Clinical Practice." One of the assignments in that course was a group project. DiPerna, a white woman, was in a group with a student named Shakira,[1] a black woman. While they were together, DiPerna and Shakira got into a discussion about "privilege." This discussion prompted Shakira to email their instructor, Dr. Patricia Perez, with "concerns about [DiPerna's] ability to work with clients of a diverse background."[2] When DiPerna's group met with Dr. Perez, DiPerna again got into a discussion about privilege, this time with a different student.

After these incidents, DiPerna complained to various TCSPP officials that she was the subject of harassment and bullying. She claimed people were calling her "color blind,"

---

[1] The parties have not informed us of Shakira's last name.

[2] *DiPerna v. Chicago Sch. of Prof'l Psychology*, 222 F. Supp. 3d 716, 719 (N.D. Ill. 2016).

making comments, and pointing at her. Despite her complaints, TCSPP took no action. DiPerna tried to withdraw from the class, but was told she could not as it was too far into the semester.

That summer, DiPerna posted an image with a racial slur on her personal Instagram account. Two black students at TCSPP complained to a professor. On August 1, 2013, DiPerna met with Dr. Virginia Quiňonez, Department Chair, and Dr. Luke Mudd, Associate Department Chair. DiPerna defended herself on the grounds that the posting was supposed to be humorous. She also objected to being punished when Shakira, whose posts contained similar language, was not.

Drs. Quiňonez and Mudd referred DiPerna to the Student Affairs Committee (SAC). After a hearing, the SAC ordered DiPerna to complete an Academic Development Plan (ADP)[3] and delayed her entry into an internship program. Though TCSPP allowed for an internal appeal of that decision, DiPerna did not pursue one. On January 3, 2014, DiPerna filed the instant lawsuit, citing the federal diversity jurisdiction statute and alleging claims for breach of contract and negligence.

DiPerna continued in school while the lawsuit was pending. In 2015, she took a required seminar course taught by Dr. Kristin Davisson. As part of that course, DiPerna completed a "Clinical Competency Examination" (CCE), which required her to set out a specific psychological theory and

---

[3] DiPerna's ADP required her to write two papers, including "a 10 page review of derogative terms associated [with] minority groups … in the U.S." (R. 96-6 at 5.)

discuss how she applied it to her clinical experiences with a patient.

The portion of the CCE in which she discusses the theory she applied was called the "Conceptualization" or "Case Formulation" section. When Dr. Davisson was reviewing DiPerna's CCE, she began to suspect DiPerna had plagiarized that section. Dr. Davisson noticed the writing style in that section was different from other sections of the paper and from DiPerna's previous work. Dr. Davisson particularly noted it was more sophisticated in word choice and frequency of sources.

Dr. Davisson's suspicions caused her to input some sentences from the paper as the terms in a Google search. After that search revealed a match, Dr. Davisson decided to run the paper through turnitin.com (Turnitin), a web-based program that compares submitted writings against a database of potential sources. This was the first time Dr. Davisson had used Turnitin in some time.

Dr. Davisson only had a hard copy of DiPerna's paper, so she personally typed DiPerna's conceptualization section (about two pages of text) into Turnitin. Turnitin returned a 92% similarity score, meaning it concluded 92% of the conceptualization section was similar to material found in other sources. Turnitin provided a list of sources that included psychology publications, a website, and other student papers.

Dr. Davisson reported these results to then Interim Department Chair Dr. Mudd. Dr. Mudd told Dr. Davisson to request an electronic copy of the paper from DiPerna so that she could run the entire paper through Turnitin, rather than

just the one section. Dr. Davisson did so, and that reduced the similarity score to 10%. Nevertheless, the conceptualization section was still extensively flagged. Dr. Mudd performed some independent verification of Turnitin's results and referred DiPerna to the SAC.

Prior to her hearing before the SAC, DiPerna received notice that nine people would make up the committee. When she showed up for her hearing on May 12, 2015, the committee did not have nine members. Nevertheless, the hearing proceeded. DiPerna argued she was being retaliated against for her lawsuit and that her 10% similarity score was insufficient to have justified a referral. The day after the hearing, DiPerna was informed she had been dismissed.

Ten days after learning of the SAC's conclusion, DiPerna sent an email to Dr. Azara Santiago-Rivera, the Dean of Academic Affairs. DiPerna characterized her email as an appeal of the SAC's decision and argued Dr. Davisson had improperly singled her out for scrutiny, the SAC had not been properly composed, and she was being targeted because of her lawsuit against the school. Neither Dr. Santiago-Rivera nor anyone else at TCSPP ever responded to DiPerna's email.

**B. Procedural History**

On June 1, 2015, DiPerna amended her complaint in this lawsuit to include claims relating to her dismissal. As amended, DiPerna's complaint made claims for breach of contract and negligence arising from six events: (1) TCSPP's failure to respond to bullying and harassment; (2) TCSPP's decision to discipline DiPerna for her Instagram post; (3) the SAC's development of DiPerna's ADP; (4) the SAC's deci-

sion to delay DiPerna's entry into an internship program; (5) the reporting of DiPerna for plagiarism; and (6) DiPerna's dismissal.

TCSPP moved for summary judgment. In response to the motion, DiPerna conceded she was barred from pursuing her claims based on the development of her ADP and the decision to delay her entry into an internship program because she had failed to internally appeal those decisions. She also conceded her claim for negligence.

On November 28, 2016, the district court denied TCSPP's motion in part and granted it in part. The district court determined there were genuine issues of material fact concerning DiPerna's claims relating to the harassment and her punishment for the Instagram post. However, the district court granted summary judgment to TCSPP on DiPerna's claims relating to her dismissal, concluding there was no evidence the SAC decided to dismiss DiPerna without a rational basis. The district court also granted summary judgment to TCSPP on DiPerna's claims for tuition and living expenses as damages. The district court reasoned that any extra tuition DiPerna had paid was the result of her ADP and her delayed internship. She had conceded her claims relating to those punishments, so she could not recover for her extra tuition. As for the living expenses, DiPerna had submitted a contract between DiPerna and her mother requiring DiPerna to repay those expenses incurred "as a result of [DiPerna's] expulsion."[4] Because the court had already concluded DiPerna's expulsion was not improper, it determined DiPerna could not recover expenses arising from it.

---

[4] (R. 182 at 6.)

After this order, the case continued toward trial on the harassment and Instagram claims. In August 2017, TCSPP filed a number of motions in limine, three of which are pertinent here. In those three motions, TCSPP sought to prevent DiPerna from presenting: (1) evidence relating to damages resulting from her dismissal; (2) evidence relating to damages for tuition, living expenses, emotional distress, and attorney's fees; and (3) the testimony of her expert witness, Dr. Stan V. Smith. The district court granted all three motions.

The district court granted the motion on evidence related to DiPerna's dismissal by simply referring to its earlier conclusion that the dismissal was lawful. DiPerna attempted to argue that her dismissal was at least partly based on her Instagram post, but the district court found no evidence of that and reasoned that, even if it were true, the plagiarism was a sufficient cause for her dismissal.

Concerning the tuition and living expenses, the district court again referred to its conclusions in its prior order. The court also barred DiPerna from presenting evidence of emotional damages because Illinois does not allow them in contract actions absent special circumstances. Nor would the court allow DiPerna to present evidence relating to attorney's fees, because DiPerna had shown no entitlement in law or contract to such fees.

Finally, the court determined Dr. Smith's testimony would not be helpful to the jury. Dr. Smith, a forensic economist, intended to testify to DiPerna's lost earnings and he-

donic damages.[5] On lost earnings, the court again relied on its decision that DiPerna's dismissal was lawful. On hedonic damages, the court determined Dr. Smith had reached his conclusion based on all of DiPerna's experiences at TCSPP, not just her experiences relating to the claims going to trial. The court also saw Dr. Smith's testimony, which went to DiPerna's "enjoyment of life," as a ploy to recover emotional distress damages. In sum, the court concluded that whatever probative value Dr. Smith's testimony may have had, it was sufficiently outweighed by the risk of undue prejudice and jury confusion.

In light of those rulings, DiPerna conceded that she was effectively barred from presenting any evidence of damages. Accordingly, the district court entered summary judgment for TCSPP on the remaining claims.[6] DiPerna now appeals, focusing on the district court's November 28 order, the motions in limine, and the final grant of summary judgment.[7]

---

[5] Hedonic damages are "[d]amages that attempt to compensate for the loss of the pleasure of being alive." *Hedonic damages*, Black's Law Dictionary (10th ed. 2014).

[6] *See generally In re Ill. Bell Tel. Link-Up II*, 994 N.E.2d 553, 559 (Ill. App. Ct. 2013) ("Damages are an essential element of a breach of contract action and a claimant's failure to prove damages entitles the defendant to judgment as a matter of law.").

[7] DiPerna's opening brief states a laundry list of orders she is allegedly challenging, but we will not address the orders on which she did not develop argument. *See Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001) ("[A] brief must contain an argument consisting of more than a generalized assertion of error … .").

## II.

### A. Summary Judgment

We review first the November 28 grant of summary judgment. Federal Rule of Civil Procedure 56 "mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "We review *de novo* the grant of summary judgment, and we construe all facts in the light most favorable to … the nonmoving party," who "must point to specific facts showing that there is a genuine issue for trial, and inferences relying on mere speculation or conjecture will not suffice." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). If we conclude "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," we will affirm the entry of summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The parties do not dispute that Illinois law governs the claims in this diversity suit. *See generally Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("[F]ederal courts sitting in diversity apply state substantive law … ."). In Illinois, "a college or university and its students have a contractual relationship, and the terms of the contract are generally set forth in the school's catalogs and bulletins." *Raethz v. Aurora Univ.*, 805 N.E.2d 696, 699 (Ill. App. Ct. 2004). However, given that "courts are reluctant to interfere with the academic affairs and regulation of student conduct in a private university setting," breach of contract claims brought by a student against a private college or university are subject to a

distinct standard: "a student may have a remedy for breach of contract when it is alleged that an adverse academic decision has been made concerning the student but *only* if that decision was made *arbitrarily, capriciously, or in bad faith*." *Id.* This requires the student to show the school's action was "without any discernable rational basis." *Id.* (internal quotation marks omitted) (quoting *Frederick v. Nw. Univ. Dental Sch.*, 617 N.E.2d 382, 387 (Ill. App. Ct. 1993)); *see also Brody v. Finch Univ. of Health Sciences/The Chicago Med. Sch.*, 698 N.E.2d 257, 266 (Ill. App. Ct. 1998). Or, put another way, the student must show the decision was "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Raethz*, 805 N.E.2d at 699 (quoting *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)).

### 1. Dismissal for Plagiarism

At oral argument in this case, DiPerna asserted she created genuine disputes of material fact as to whether she plagiarized and whether she violated TCSPP's plagiarism policy. In her brief and at argument, she emphasized that Turnitin scores are not conclusive proof of plagiarism and TCSPP's policy on what constituted plagiarism sufficient to warrant referral to the SAC was unclear. In support of her arguments on the latter point, she presented a syllabus from her "Diversity" class stating that a student would automatically be reported for plagiarism if something they turned in received a Turnitin score of 20% or higher.[8] Because DiPer-

---

[8] (R. 96-6 at 42.)

na's paper only received a 10%, she believes her referral was arbitrary and capricious.

These arguments are red herrings. Concerning TCSPP's policy on referrals for plagiarism, the Academic Catalog and Student Handbook (Handbook) states: "All suspected incidents [of academic dishonesty, which includes plagiarism,] must be immediately referred to the Department Chair/Lead Faculty or designee who will then refer the matter to the Student Affairs Committee."[9] The Diversity class syllabus does not put that express policy in doubt. All it does is provide students in that course what amounts to a Turnitin-score safe harbor—the instructor will automatically suspect plagiarism solely on the basis of a Turnitin score only if it is greater than or equal to 20%. The syllabus does not negate TCSPP's policy that "all suspected incidents" must be reported, and it certainly does not call into question Dr. Davisson's actions here. Dr. Davisson suspected plagiarism based on her observations of DiPerna's work (i.e., the more sophisticated word choice), and from that moment a referral was not only appropriate but mandated by the Handbook. DiPerna's quibbling about required Turnitin percentages is just a distraction.

So is DiPerna's argument concerning whether there is a genuine issue of material fact as to whether she plagiarized. That was the question for the SAC to decide based on TCSPP's policy, which is explicitly broad, covering intentional and unintentional conduct, down to "a single example of failing to use quotation marks."[10] We will only disturb the

---

[9] (R. 96-1 at 77.)

[10] (*Id.*)

SAC's decision that DiPerna plagiarized if it was made without a rational basis. The only evidence we have relating to DiPerna's plagiarism that could have been available to the SAC are DiPerna's arguments about unfair treatment, Dr. Davisson's observations, a Turnitin report suggesting almost complete similarity in the conceptualization section of DiPerna's paper, and Dr. Mudd's statement that he did some independent verification before he made the referral. Given this evidence, we are not prepared to say it was irrational for the SAC to conclude DiPerna had plagiarized. DiPerna stresses to us that Turnitin is not the most authoritative tool for detecting plagiarism, and that may be true. But the Turnitin score is undeniably *some* evidence that plagiarism occurred, particularly in light of Dr. Mudd's independent verification of the Turnitin report. DiPerna cannot meet Illinois's high burden for student plaintiffs in relation to the decision to dismiss her for plagiarism, and summary judgment was proper.[11]

---

[11] DiPerna also argues TCSPP's failure to respond to her appeal and the fact that the SAC was not made up of nine members shows that the dismissal decision was arbitrary and capricious. First, we fail to see how the failure to respond to an appeal makes the SAC's initial decision irrational. Perhaps DiPerna would have an independent claim for an irrational decision not to address her appeal, but she does not even mention the appeal in her complaint. (*See* R. 59.) Neither does DiPerna explain how the SAC's composition affected the rationality of the SAC's decision. *See Raethz*, 805 N.E.2d at 700 (refusing to accept the argument that "any failure by a university to comply with the terms set forth in the university's catalogs or manuals [amounts] to *per se* arbitrary and capricious conduct").

*2. Damages*

Summary judgment was also appropriate concerning DiPerna's entitlement to living expenses and tuition as damages. In responding to TCSPP's motion for summary judgment, DiPerna submitted a contract between herself and her mother providing that DiPerna was obligated to pay her mother back for living expenses incurred "as a result of [DiPerna's] expulsion from The University of Chicago [sic]."[12] The misnomer aside, the contract shows that DiPerna's claim for living expenses arose from her dismissal. We have just concluded her dismissal was not improper, so she is not entitled to recover for living expenses incurred because of it.

Concerning her claims for tuition, the district court concluded they arose from the punishment—the ADP and the delay in entering her internship—she received from the SAC after her first referral to that body for her Instagram post. Because DiPerna conceded her claims relating to the ADP and the internship delay, the district court held that she could not seek tuition damages.

DiPerna argues the district court missed a fine distinction: she only conceded her claims based on the development of her ADP and the imposition of delaying her internship, and it was the referral to the SAC itself that caused her to incur extra tuition. That argument defies common sense. The referral to the SAC, alone, did not cause DiPerna to incur any extra tuition costs. The Handbook makes clear the SAC is a forum for accused students to receive "an impartial

---

[12] (R. 182 at 6.)

committee review."[13] A punishment resulting in increased tuition costs, or even the decision to render some form of punishment at all, was not a guaranteed result of the referral. The SAC could have concluded DiPerna did nothing wrong, or it could have imposed a punishment that did not require her to extend her time in school. Accordingly, it was the SAC's decision to impose the specific punishments of the ADP and delayed entry into an internship, not the mere referral to that body or a general decision to punish, that caused DiPerna's increased tuition expenses. She withdrew her claims addressing the imposition of those punishments. As she had no claims arising from conduct that caused her tuition damages, summary judgment on her right to recover such damages was and is appropriate.[14]

**B. Motions in Limine**

We turn now to the motions in limine. "We review [a] district court's rulings on motions in limine for an abuse of discretion." *Heft v. Moore*, 351 F.3d 278, 283–84 (7th Cir. 2003). Here, DiPerna challenges the grant of three motions: one relating to her ability to present evidence of damages relating to her dismissal, one relating to evidence of various other damages, and one relating to her expert, Dr. Smith. But DiPerna appeals the district court's decisions only as they relate to her entitlement to present evidence of damages arising from her dismissal. We therefore consider only that argument. *See Grandberry v. Smith*, 754 F.3d 425, 428 (7th Cir.

---

[13] (R. 96-1 at 74.)

[14] DiPerna suggests she also incurred living-expenses damages from the punishment, but that argument fails for the same reason.

2014) ("Arguments must be presented in the briefs; these were not and have been forfeited … .").

DiPerna's argument is twofold. First, she argues her dismissal for plagiarism was unlawful. We already decided it was not, so we may move to her second point: her dismissal was caused at least in part by her first referral to the SAC for the Instagram post. Her evidence in support of this theory is that the SAC requested information from her first hearing before it dismissed her for plagiarism. But, as the district court found, even if the SAC concluded that DiPerna should be dismissed partially for her Instagram post, its conclusion that she plagiarized was a sufficient reason to dismiss her anyway. Consequently, she is not entitled to damages as the result of a dismissal that was not improper.

Her tuition and living-expenses claims fail for the same reason. DiPerna raises the same arguments she did against the district court's summary judgment decision, and they are just as unavailing. The same holds true concerning the testimony of her expert, Dr. Smith. DiPerna has relied on her attempt to convince us summary judgment was improper. We are unconvinced and will not disturb the district court's rulings.

### III.

Despite DiPerna's arguments she did not plagiarize, our role in her case against TCSPP was not to decide whether TCSPP "exercised its academic judgment unwisely," but only whether it "exercise[d] its academic judgment at all." *Raethz*, 805 N.E.2d at 700. We conclude there is no genuine issue of material fact on that point, nor is there any merit to Di-

Perna's other arguments. Therefore, the challenged decisions are AFFIRMED.