*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JAMES ALLEN,

        Plaintiff-Appellant,

v

MICHIGAN STATE UNIVERSITY and BOARD
OF TRUSTEES OF MICHIGAN STATE
UNIVERSITY,

        Defendants-Appellees.

FOR PUBLICATION
December 04, 2024
12:14 PM

No. 358135
Court of Claims
LC No. 20-000057-MK

---

ALISA OLIN and MATTHEW OLIN,

        Plaintiffs-Appellants,

v

MICHIGAN STATE UNIVERSITY,

        Defendant-Appellee.

No. 358136
Court of Claims
LC No. 20-000101-MK

---

RICHARD PLACKO, CINDY PLACKO, and
MEGAN PLACKO,

        Plaintiffs-Appellants,

v

MICHIGAN STATE UNIVERSITY and
MICHIGAN STATE UNIVERSITY BOARD OF
TRUSTEES,

        Defendants-Appellees.

No. 358137
Court of Claims
LC No. 20-000120-MK

Before: BORRELLO, P.J., and N. P. HOOD and YOUNG, JJ.

BORRELLO, P.J.

In these consolidated appeals,[1] plaintiffs appeal by right the final order of the Court of Claims granting summary disposition in favor of defendants, Michigan State University and the Michigan State University Board of Trustees (collectively, MSU). For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

These cases arise out of MSU's response to the COVID-19 pandemic during the spring of 2020. Plaintiffs James Allen, Matthew Olin, and Megan Placko were students at MSU during the Spring 2020 semester.[2] Plaintiff Alisa Olin is Matthew's mother, and plaintiffs Richard Placko and Cindy Placko are Megan's parents.

On March 10, 2020, Governor Gretchen Whitmer declared a statewide state of emergency after the first two presumptive-positive cases of COVID-19 in Michigan had been identified. Executive Order No. 2020-4. On March 11, 2020, MSU President Samuel L. Stanley Jr., M.D., sent a communication to the MSU community indicating that the university was "suspending face-to-face instruction in lectures, seminars and classroom settings and moving coursework to virtual instruction" until April 20, 2020, subject to ongoing reevaluation as more information became available. The letter further stated in relevant part:

> We are continuing to work with faculty and staff on laboratory and performance classes, and the university will provide additional guidance in the coming week. This will be an evolving process and I ask for everyone's patience.

> During this time period, students doing purely remote work can return to their permanent place of residence and we strongly encourage this because there are advantages for social distancing. But for those not able to go home, we will continue to fully support students in our residence halls and dining facilities. Regardless of where our students are, we encourage them to practice appropriate social distancing and enhanced preventative public health measures such as those we've previously discussed . . . .

On March 16, 2020, Vennie Gore, MSU Vice President for Auxiliary Enterprises, sent a letter to MSU on-campus residents reiterating that although students were encouraged to return to

---

[1] *Allen v Mich State Univ*, unpublished order of the Court of Appeals, entered August 30, 2021 (Docket Nos. 358135, 358136, and 358137).

[2] We note that all three previously consolidated actions were brought as purported class actions. However, the issue of class certification is not pertinent to the issues raised on appeal. We therefore only refer to the named plaintiffs.

their permanent residences if possible, students could remain in on-campus housing if leaving campus was not possible or if MSU was a student's permanent home. The letter further stated that MSU was offering a $1,120 credit to students who checked out of on-campus housing by April 12.[3]

On April 16, 2020, Allen filed an action in the Court of Claims seeking partial refunds of money paid for tuition, room and board, and other fees because he allegedly did not receive the expected benefit of those payments. Allen raised claims of breach of contract and unjust enrichment based on each of these three categories. He alleged that he had entered into a contract with MSU to pay tuition in exchange for "live in-person instruction in a brick and mortar classroom" and that MSU had breached that contract by transitioning the remainder of the Spring 2020 semester to online distance learning platforms that were inferior to in-person classes without refunding the difference in value. With respect to room and board, Allen alleged that MSU breached its contractual agreement to provide housing by failing to provide housing for the entire semester without fully refunding the unused portion of Allen's room and board payments. Allen also alleged that MSU had breached its contract to provide "services" in exchange for other "fees" by closing MSU buildings and cancelling student activities for the remainder of the semester without refunding unused fees that had been collected. Finally, Allen raised a corresponding unjust enrichment claim for each of these three categories.

The Olins filed a somewhat similar complaint in the Court of Claims, seeking partial refunds of tuition and fees based on claims of breach of contract, breach of implied contract, unjust enrichment, conversion, and money had and received. They alleged that MSU had breached its contractual obligation, whether express or implied, to provide "in-person educational services, experiences, opportunities, and other related services" for the entire semester in exchange for the tuition and fees the Olins paid. For the unjust enrichment claim, the Olins alleged that MSU had unjustly retained the full benefit of tuition and fee payments without fully providing the "in-person and on-campus live education and access to MSU's services and facilities for which tuition and the mandatory fees were paid." Additionally, the Olins alleged that MSU had converted a portion of the tuition and fees collected from the Olins when MSU "canceled a portion of the semester, moved all in-person classes to a remote online format, canceled all on-campus events, and discontinued services for which the mandatory fees were intended to pay, all while retaining the property (tuition and portions of the mandatory fees)." Finally, the Olins asserted a claim for money had and received based on MSU's retention of tuition and fees "while not providing in-person educational services, activities, opportunities, resources, and facilities for which those monies were paid."

The Plackos also filed a complaint in the Court of Claims, seeking partial refunds of tuition, room and board, and fee payments based on similar claims of breach of contract, unjust enrichment, and conversion. They alleged that MSU breached contracts to provide (1) "live in-person instruction in a physical classroom" in exchange for tuition by moving all classes to online formats without refunding or reducing tuition; (2) "services . . . as advertised" in exchange for fees

---

[3] It appears that this letter was only submitted in Allen's case. However, the room-and-board issue is only relevant in Allen's appeal.

-3-

by closing campus facilities and canceling student activities, and (3) housing and meals for the entire semester in exchange for room-and-board payments. The Plackos further asserted corresponding unjust enrichment and conversion claims for each category. Although these three actions were eventually consolidated in the Court of Claims, they initially proceeded separately. In Allen's case, MSU filed concurrent motions for a protective order staying discovery and for summary disposition under MCR 2.116(C)(8). Allen had not attached any documents to his complaint purporting to constitute contracts that supported his claims. MSU first argued that Allen's tuition-and-fee-based contract claims should be dismissed because Allen had the burden to prove the existence and terms of any contract on which he relied, and he could not demonstrate that there was a contract regarding the "manner" in which MSU would provide instruction or spend specific fees. MSU maintained that such agreements did not exist. Regarding the contractual-room-and-board claim, MSU attached to its motion for summary disposition a copy of the written Student Housing Contract and argued in relevant part that the $1,120 credit that Allen accepted for room and board when he moved off campus was consistent with the refund provision in the written contract.

Additionally, MSU argued that it was entitled to summary disposition on the unjust enrichment claims because it was empowered to manage expenditures under Michigan's Constitution. With respect to room and board, MSU argued there was an express written contract covering the subject matter. The trial court granted MSU's motion for a protective order and stayed discovery pending the resolution of the summary disposition motion. The trial court also entered an order stating in relevant part as follows:

> One critical issue presented in the [summary disposition] motion is whether an express or implied written contract for in-person instruction exists. Though plaintiff claims that a written contract for in-person instruction does exist, no written contract was attached to the complaint. And though plaintiff alleged per court rule that the contract is in the possession of defendants, defendants disclaim possession of any such contract. Accordingly, in order to properly determine the pending motion, the Court orders plaintiff to submit to the Court any and all documents currently in [his] possession that forms the basis for [his] assertion that a written express or implied contract exists with respect to receiving only in-person instruction.

Allen responded to the trial court's order by submitting 13 exhibits consisting of "a selection of documents provided by the University to its students describing the various academic program offerings and the consideration (tuition) students must provide to enroll in these programs." Allen argued:

> These exhibits contain some of the representations made by the University which created the contractual obligation to provide live in-person instruction. The terms of the parties' relationship are governed not just by the University's representations, but also by the parties' reasonable expectations. Thus, the documents referenced in this filing not only fill in the details as to what the University represented it would provide to students, they are also relevant to the determination of the parties' mutual expectations and the reasonableness of students' expectation that classes would be in-person. The attached Exhibits demonstrate that MSU represented that when a

-4-

student elected to take a class in-person, the modality of instruction for that class would be in-person. At most, MSU's arguments against enforcement of that expectation, betray an ambiguity on the issue, which can only be resolved by applying the reasonable expectation that instruction would be in-person where the student registered for that mode of instruction.

Allen's exhibits consisted of sample pages from the 2020 Spring Term Class Schedule Listing for various programs offered by the University, the MSU Union Student Guide, and multiple pages of what appear to be promotional materials from MSU's website regarding various facilities, departments, and programs at the university. The 2020 Spring Term Class Schedule Listing pages provided physical meeting locations and times for traditional classes and expressly designated other classes as "online" or "hybrid" classes. The classes designated as "hybrid" indicated that they blended online and in-person learning. The other exhibits, which were essentially promotional materials for the university, contained what Allen characterized as "a wide variety of representations to . . . students that [MSU] would provide in-person instruction [and activities] on the University's campus."

The trial court issued a written opinion and order granting MSU's motion for summary disposition in part and denying the motion in part, considering the motion under both MCR 2.116(C)(8) and (C)(10). First, the court granted summary disposition in favor of MSU on Allen's three breach-of-contract claims and dismissed those counts. After considering the exhibits submitted by Allen, the trial court determined that "[n]one of these documents include the required elements of a contract" or "contain a promise that, with the payment of tuition, MSU would exclusively provide in-person instruction." The court reasoned:

That the brochures and catalogs were written with the expectation that instruction would be in-person does not create a contractual promise that no matter the circumstance, all instruction would be in-person. Rather, the brochures merely explain the types of classes available and the possibility of "hands-on" experience or instruction in the different university facilities.

Accordingly, the trial court concluded that there was "no genuine issue of material fact that there is no contract between plaintiff and MSU promising live, in-person instruction only in exchange for tuition payments" and that MSU was therefore entitled to summary disposition as a matter of law on the tuition-based breach-of-contract claim because Allen could not show the existence of a contract.

Regarding the fee-based contract claim, the trial court similarly concluded that there was "no genuine issue of material fact that no contract exists regarding student services" because there were "no documents containing promises relative to services to be provided in exchange for a fee, what the fees would go toward, or any other material provisions found in a contract." The court, therefore, dismissed this claim.

Concerning the room-and-board contract claim, the trial court noted the existence of the written housing contract included dining services, which MSU had provided. However, the trial court concluded that there was no genuine issue of material fact regarding whether MSU had breached the contract by encouraging students to leave campus if possible, continuing to provide

room and board for students who chose to stay, and offering credit to students who opted to leave campus. The court relied on a provision in the contract that specifically allowed MSU to breach the contract by encouraging students to leave campus if possible, continuing to provide room and board for students who elected to stay, and offering credit to students who elected to leave campus. The court relied on a provision in the contract that specifically allowed MSU to "terminate or temporarily suspend the Contract or any part of it, without notice, in case of an emergency that would make continued operation of resident housing impossible." The court also concluded that the credit offered by MSU to students who left campus was consistent with the amount students could obtain under the "Contract Buyout" provision if they chose to move out of campus housing early.

The trial court also determined that MSU was entitled to summary disposition on Allen's unjust enrichment claim regarding room and board because there was an express written contract for room and board. However, the trial court denied MSU's motion for summary disposition regarding the tuition-and-fee-based unjust enrichment claims. The court reasoned:

> [W]here no express contract exists regarding tuition and fees, and summary disposition under MCR 2.116(C)(8) is based on the pleadings alone, . . . plaintiff has sufficiently pleaded a claim for unjust enrichment related to tuition and fees in Counts IV and VI. In Count IV, plaintiff alleged that (1) MSU received tuition payment from plaintiff and other members of the tuition class, and (2) plaintiff experienced an inequity when MSU kept the tuition payment, but provided online rather than in-person instruction for the remainder of the semester. . . . In Count VI, plaintiff alleged that (1) MSU received payment for student services from plaintiff and other members of the fee class, and (2) plaintiff experienced an inequity when MSU kept the fee payment, but did not provide student services for the remainder of the semester. . . . Plaintiff alleges that this unjustly enriched MSU. MSU's arguments based on its constitutional authority to control expenditures and plaintiff's lack of standing because his family paid for room and board are unavailing. On the basis of plaintiff's pleadings alone, . . . summary disposition of plaintiff's unjust enrichment claims related to tuition and fees is improper. MCR 2.116(C)(8).

MSU filed a motion for partial reconsideration, arguing that it was also entitled to summary disposition on the remaining unjust enrichment claims. MSU asserted that it was not unjustly enriched by retaining total tuition payments because "tuition is based on *credit hours*, *not* the *format* of the class" and MSU thus did not receive a windfall from Allen's tuition payment. MSU further argued that its catalog contained "a clear reservation of rights giving MSU absolute discretion to make changes to its academic programs and course formats," therefore, it was not unjust for MSU to exercise this discretion. Additionally, MSU contended that an unjust enrichment claim could not be based on a purported difference between the quality of instruction obtained and the expected quality. In support, MSU referred to record evidence consisting of portions of MSU's catalog. The catalog specifically provided that "[c]harges will be assessed on a credit hour basis, except for graduate-professional student fees which are assessed on a semester basis and some graduate student fees which are assessed on a semester or program basis . . ." and that "[t]he University reserves the right to make changes in its programs, policies, rules,

regulations, procedures, fees, tuition, housing rates, organizational structure, and faculty and staff through the appropriate University processes."

In a written opinion and order, the trial court granted MSU summary disposition on Allen's tuition-based unjust enrichment claim because the evidence reflected that there was no genuine issue of material fact regarding whether tuition was charged per credit hour and that Allen would have thus been charged the same amount of tuition for online courses. Thus, the trial court established that MSU was not unjustly enriched by retaining the tuition. However, the trial court denied MSU's motion concerning the fee-based unjust enrichment claim.

Meanwhile, MSU had also moved for summary disposition under MCR 2.116(C)(8) of the claims in the Plackos' case. The Plackos failed to attach any documents to their complaint that could be deemed contracts supporting their claims. MSU's motion for summary disposition challenged the tuition-and-fee-based contract claims on the same grounds as in Allen's case. MSU asserted that the Plackos did not demonstrate any personal loss related to room and board, making their room-and-board contract claim untenable. Regarding unjust enrichment, MSU maintained that it was entitled to summary disposition because it had the authority to manage expenditures under Michigan's Constitution and an express written contract pertaining to room and board. Concerning the conversion claims put forward by the Plackos, MSU argued that summary disposition was warranted, as a claim for money conversion can only be sustained if a duty exists to keep intact or deliver specific identifiable money. The trial court issued a written opinion and order granting MSU's motion in part and denying it in part. Noting that both parties had attached exhibits to their summary disposition filings, the court considered the motion under both MCR 2.116(C)(8) and (C)(10).

The trial court determined that there was no evidence of any promise that MSU would exclusively provide in-person instruction in exchange for tuition, that the Plackos had not alleged the existence of any documents that would establish such a contract, and that the course catalog contained a reservation of rights clause permitting MSU to: "make changes in its programs, policies, rules, regulations, procedures, fees, tuition, housing rates, organizational structure, and faculty and staff through the appropriate University processes." Thus, the court concluded that MSU was entitled to summary disposition on the tuition-based contract claim because there was no genuine issue of material fact regarding the alleged contract's existence or, if the contract existed, whether there was a breach. The trial court also granted MSU summary disposition on the fee-based contract claim because there was no evidence of a contractual promise regarding the services to be provided in exchange for fees and because there was no breach due to the reservation of rights clause. The court dismissed the room-and-board contract claim because the Plackos did not contest that Megan did not live in on-campus housing; therefore, she did not have standing to bring this claim on her behalf or on behalf of the asserted class. Furthermore, the court concluded that there was no genuine issue of material fact that a breach could not be established.

In terms of unjust enrichment, the trial court determined that a written contract for housing and dining barred the room-and-board claim. Additionally, the trial court affirmed MSU's entitlement to summary disposition on the tuition claim, citing unrebutted evidence that tuition was based on credit hours rather than class format. Nonetheless, the court denied MSU's motion for summary disposition regarding the fee-based unjust enrichment claim under MCR 2.116(C)(8), stating that this claim was adequately pled and that there was no proof of an express contract.

Lastly, regarding conversion, the trial court found that the Plackos had not articulated a claim for relief concerning tuition, fees, and room and board, as they could not demonstrate that MSU acted wrongfully or unlawfully in managing the funds.

In the Olins' case, MSU also moved for summary disposition and raised arguments similar to those described in the other cases. Unique to the Olins' case was the claim for money had and received, which MSU argued was equivalent to an unjust enrichment claim and should be dismissed for the same reasons.

The trial court issued a written opinion and order granting MSU's motion on all of the Olins' claims with the exception of the unjust enrichment claim regarding fees. The court considered the motion under both MCR 2.116(C)(8) and (C)(10). The trial court granted MSU's summary disposition motion on the contract claims because there was no evidence of the relevant contract or that the contract was breached if it existed. Regarding the contract claims, the court explained:

> There is no evidence that the documents plaintiffs refer to—the course catalog, website, and promotional materials—include the required elements of a contract, or any promise that, with the payment of tuition and fees, MSU would exclusively provide in-person instruction and on-campus services. . . .
>
> . . . Nor have plaintiffs alleged or otherwise suggested that there are other documents other than brochures, informational pamphlets, academic course outlines, etc., that comprise the alleged contracts, express or implied. Therefore, there is no genuine issue of material fact that there are no contracts between plaintiffs and MSU promising live, in-person instruction only and on-campus services only in exchange for tuition and fee payments. Because plaintiffs cannot establish that such contracts exist, the express and implied breach-of-contract claims regarding tuition and fees fail, and MSU is entitled to summary disposition as a matter of law. . . .

Furthermore, noting the reservation of rights clause in the catalog and the financial responsibility statement[4] to which students agree, the court determined that

> assuming arguendo that plaintiffs could establish the existence of a contract and the first element of a breach-of-contract claim, there is no genuine issue of material fact that plaintiffs cannot establish a breach because of the reservation of rights clause and the financial responsibility statement. . . . The reservation of rights clause allows MSU to modify its courses and programs, which it did when it transitioned to online learning. The reservation of rights clause also allows MSU to make

---

[4] The financial responsibility statement provided: "I understand that when I enroll/register for any class at Michigan State University (MSU) or receive any service from MSU, I accept full responsibility to pay all tuition, fees, housing and other associated costs assessed as a result of my registration and/or receipt of services."

changes in its fees. And each student agrees to be responsible for tuition and fees upon agreeing to the financial responsibility statement.

Subsequently, the trial court granted summary disposition in favor of MSU on the unjust enrichment claim about tuition on the grounds that there was uncontradicted evidence indicating that tuition was determined by credit hours rather than the class format. Consequently, the tuition charged would have remained constant for online and in-person classes. The court deduced that there was no legitimate question of material fact regarding whether MSU had been enriched. Nevertheless, akin to the other two cases, the trial court denied MSU's motion for summary disposition concerning the fee-based unjust enrichment claim. Additionally, the court granted summary disposition to Michigan State University on the conversion claim, employing the same rationale as in the Plackos' case. The court also granted MSU summary disposition on the money-had-and-received claim, concluding that "plaintiffs have no claim against MSU that it had in its possession money which in equity and good conscience belonged to plaintiffs because instruction and services were still provided, and plaintiffs suffered no compensable loss."

After the above rulings in each case by the trial court, these three cases were consolidated to address the issue of whether MSU was unjustly enriched by retaining fees paid for services during the portion of the Spring 2020 semester held remotely.

MSU subsequently moved for summary disposition of the remaining unjust enrichment claims under MCR 2.116(C)(10). MSU submitted evidence, including an affidavit by Assistant Vice President for Student Affairs Allyn R. Shaw, Ph.D., showing that the student fees were used to fund Associated Students of Michigan State University (ASMSU), which is MSU's undergraduate student government; the Residence Hall Association (RHA), which is MSU's on-campus residence hall governing group; Impact 89FM, which is the student radio station; and The State News, which is the student newspaper. These fees amounted to $21, $25, $3, and $7.50, respectively.[5] Shaw further averred that these organizations continued to operate and serve students during the remainder of the Spring 2020 semester after the onset of the COVID-19 pandemic; there was no interruption in Impact 89FM's broadcast, The State News continued to report on events and produce new content, ASMSU and RHA continued to convene remotely and allocated over $265,000 to COVID-19 support for students, and students continued to have access to various services provided by ASMSU and RHA. Shaw also averred that these organizations did not realize substantial cost savings during the second half of the Spring 2020 semester. MSU argued that plaintiffs thus received a benefit in return for the fees they paid and that MSU did not realize a financial windfall or unjust profit.

In response, plaintiffs argued that MSU's retention of all fees was inequitable because plaintiffs were denied the opportunity to attend live, in-person events and plaintiffs did not receive all of the services covered by the fees. In support of these assertions, plaintiffs attached sworn "declarations" of plaintiffs Megan Placko and Matthew Olin. In her declaration, Megan stated:

---

[5] Billing statements submitted by MSU reflected that of the three student plaintiffs, only Allen paid the RHA fee.

6. Because Defendants cancelled events in the Spring 2020 Semester, I was denied, among other things, the opportunity to (1) attend MSU's March 19, 2020 Testing and Tasting: Practice Talk and CAL Care Week 2020 events, (2) March 25, 2020 Innovate Speaker Series: Bob Fish, (3) April 2, 2020 Java & Jam, (4) April 18, 2020 Global Day of Service, (5) IT'S ON US Week of Action, (6) all MSU Film Collective events, (7) all Innovate State Speaker Series events, (8) all Visiting Artist Lecture events, 9) the Spring Concert and (10) my on-campus graduation Commencement. Cancellation of many of these events is posted on MSU's website . . . .

7. I was also denied the opportunity to utilize the following services, or received no benefit from these services, which were part of the benefits resulting from payment of the ASMSU Tax (at least in part as discussed above), and State News Tax. To the best of my recollection, the State News continued to publish during the Spring 2020 semester, but the type of articles published was limited as compared to earlier publications and primarily reported on Covid-19 and restated information previously sent to me by MSU. As a result of this change, I did not benefit from the State News during the second half of the Spring 2020 semester.

Similarly, Matthew stated in his declaration that because MSU "cancelled events in the Spring 2020 Semester," he was denied the opportunity to attend CALE Care Week 2020 events "focusing on selfcare and community," speaker Bob Fish on business and entrepreneurship, an April 2, 2020 MSU alumni networking event titled "Java & Jam," the April 18, 2020 Global Day of Service, Film Collective events, Innovate State Speaker Series events, Visiting Artist Lecture events, Spring Concert, IT'S ON US Week of Action, Counseling and Psychological Services Connect Sessions and Outreach Services, intramural sports, and in-person events held by registered student organizations and the MSU Class Council. Matthew also stated that he was unable to use the MSU Safe Ride Program and the Resource Center for Persons With Disabilities "in a private manner."

The trial court issued a written opinion and order granting MSU's motion for summary disposition and dismissing the case. The court concluded that there was no genuine issue of material fact that the fees at issue continued to support services or programs offered or sponsored by the organizations that received the fees as funding. The court further concluded that there was no evidence to support a finding that it was inequitable for MSU to retain the fees for the remainder of the 2020 semester.

These appeals followed.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Zwiker v Lake Superior State Univ*, 340 Mich App 448, 473; 986 NW2d 427 (2022). Summary disposition is proper under MCR 2.116(C)(10) "if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id*. at 473-474. "The existence and interpretation of a contract are questions of law reviewed de novo." *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006). We also review de novo as a question of law

whether contract language is ambiguous. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003). "Whether a specific party has been unjustly enriched is generally a question of fact," but "whether a claim for unjust enrichment can be maintained is a question of law, which we review de novo." *Morris Pumps v Centerline Piping, Inc*, 273 Mich App 187, 193; 729 NW2d 898 (2006). This Court "review[s] de novo a trial court's dispositional ruling on an equitable matter." *Id*. "When reviewing a decision under MCR 2.116(C)(10), this Court considers the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Zwiker*, 340 Mich App at 473.

## III. ANALYSIS

### A. TUITION AND FEES

The paramount issue raised by these appeals pertains to the existence of an express or implied contract that confers upon the plaintiffs the right to seek recovery from MSU. This inquiry is particularly relevant considering MSU's transition from conventional in-person instruction and on-campus student activities and services to an online remote delivery format during the latter portion of the Spring 2020 semester, necessitated by the COVID-19 pandemic.

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014). "The party seeking to enforce a contract bears the burden of proving that the contract exists." *AFT Mich v State of Michigan*, 497 Mich 197, 235; 866 NW2d 782 (2015). Moreover, the party claiming a breach of contract is required to prove the "*terms*" of the contract that the defendant allegedly breached. *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 554; 904 NW2d 192 (2017) (emphasis added).

A contract may be express or implied. *McInerney v Detroit Trust Co*, 279 Mich 42, 46; 271 NW 545 (1937). An express contract has been defined as "one in which the terms were openly uttered and avowed at the time of the making" or "one where the intention of the parties and the terms of the agreement are declared or expressed by the parties, in writing or orally, at the time it is entered into." *Id*. (quotation marks and citations omitted).

Alternatively, a contract may instead be implied from the circumstances:

"There are two kinds of implied contracts; one implied in fact and the other implied in law. The first does not exist, unless the minds of the parties meet, by reason of words or conduct. The second is quasi or constructive, and does not require a meeting of minds, but is imposed by fiction of law, to enable justice to be accomplished, even in case no contract was intended." [*McInerney*, 279 Mich at 49 (quotation marks and citation omitted); see also *City of Highland Park v State Land Bank Authority*, 340 Mich App 593, 604; 986 NW2d 638 (2022) (stating the same rule).]

Thus, an implied-in-fact contract requires mutual assent just like any other contract, with the difference being that in the case of an implied-in-fact contract, the mutual assent is inferred from the parties' words and actions since the parties did not directly express their mutual assent

-11-

and intent to contract. *McInerney*, 279 Mich at 49; *Erickson v Goodell Oil Co*, 384 Mich 207, 212; 180 NW2d 798 (1970). "A contract is implied in fact where the intention as to it is not manifested by direct or explicit words between the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them, or other pertinent circumstances attending the transaction." *Erickson*, 384 Mich at 212. "A contract implied in fact arises under circumstances which, according to the ordinary course of dealing and common understanding, of [people], show a mutual intention to contract." *Id*. at 211-212.

In contrast, the concept of an implied-in-law contract—which is a quasi-contract—is intricately linked with the concept of unjust enrichment. See *McInerney*, 279 Mich at 49; *City of Highland Park*, 340 Mich App at 604 ("Quasi-contract doctrine is itself a subset of the law of unjust enrichment.") (quotation marks and citation omitted). "Even though no contract may exist between two parties, under the equitable doctrine of unjust enrichment, [a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Morris Pumps*, 273 Mich App at 193 (quotation marks and citation omitted; alteration in original). "The theory underlying quantum meruit recovery is that the law will imply a contract in order to prevent unjust enrichment when one party inequitably receives and retains a benefit from another." *Id*. at 194. To sustain a claim that a contract should be implied in law to prevent unjust enrichment, a plaintiff must show: "(1) receipt of a benefit by the defendant from the plaintiff and, (2) which benefit it is inequitable that the defendant retain." *Dumas v Auto Club Ins Ass'n*, 437 Mich 521, 546; 473 NW2d 652 (1991) (opinion by RILEY, J.) (quotation marks and citation omitted).

Plaintiffs assert a right to recover under theories of express, implied-in-fact, and implied-in-law contracts. They contend that they paid for and anticipated in-person delivery of education and the availability of services. Plaintiffs argue that the online alternatives provided were inherently inferior and did not constitute the product for which they had contracted. Consequently, they claim entitlement to a partial refund based on the disparity between the anticipated and actual value delivered by MSU. Furthermore, plaintiffs argue that the contract with MSU, which promised in-person education and services, is evidenced by the course catalog, brochures, advertisements, promotional materials, and the online student portal. In an alternate argument, plaintiffs maintain that an implied-in-fact contract existed based on the conduct of the parties, MSU's historical practice of providing in-person education on campus, and the aforementioned written materials that led both them and MSU to reasonably believe that they were engaging in an exchange of tuition payments for in-person, on-campus instruction and access afforded by the university. Additionally, plaintiffs assert that MSU has been unjustly enriched by retaining the entirety of the tuition and fees paid by the plaintiffs without fulfilling the expected semester of in-person education and services. Instead, they argued, MSU offered only inferior emergency online courses and canceled on-campus activities and events.

MSU contends that the contracts alleged by plaintiffs were never made because MSU never promised to provide only in-person instruction and services, even amid a global pandemic, and MSU never promised to issue refunds if in-person learning and activities were interrupted by a pandemic. MSU argues that not only did plaintiffs fail to provide any evidence that the alleged contract existed, but plaintiffs also failed to allege any facts supporting a claim that such a contract was made. Furthermore, MSU contends that this Court, in *Cuddihy v Wayne State Univ Bd of Governors*, 163 Mich App 153; 413 NW2d 692 (1987), rejected the notion that student handbooks or other similar informational materials may create implied contracts between a student and

-12-

university. More broadly, MSU also asserts that its decisions regarding how to deliver education and services, including under the circumstances of an unexpected global pandemic, remain within the exclusive purview of the university as an academic institution. Therefore, students do not have any implied contractual rights to expect any specific form of instructional delivery or student services. MSU argues that it expressly retained its discretion to modify programs and policies in a reservation of rights clause contained in the academic catalog, even if that catalog was construed as a contract. Regarding unjust enrichment, MSU maintains that it could not have been unjustly enriched by transitioning to online instruction because per-credit-hour tuition is the same for in-person and online courses. Additionally, MSU argues that it was not unjustly enriched by retaining the fees collected because the organizations funded by those fees continued to operate, and there was no evidence that the plaintiffs' fees secured any particular or specific event, activity, or service terminated during the pandemic.

We begin our analysis by considering whether there was an express contract. As mentioned earlier, an express contract is "one where the intention of the parties and the terms of the agreement are declared or expressed by the parties, in writing or orally, at the time it is entered into." *McInerney*, 279 Mich at 46 (quotation marks and citations omitted). "A valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *AFT Mich*, 497 Mich at 235. "Fundamentally, a contract is a promise or a set of promises for which the law recognizes a remedy in the event of a breach of those promises. 1 Restatement Contracts, 2d, § 1, p 5. A promise, in turn, is 'a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.' *Id*. at § 2, p 8." *Bodnar v St John Providence, Inc*, 327 Mich App 203, 212; 933 NW2d 363 (2019). "Before a contract can be completed, there must be an offer and acceptance. . . . Further, a contract requires mutual assent or a meeting of the minds on all the essential terms." *Kloian*, 273 Mich App at 452-453 (quotation marks and citation omitted). "A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Id*. at 454 (quotation marks and citation omitted).

Here, plaintiffs have not cited any record evidence demonstrating that MSU affirmatively promised and committed itself to providing only in-person instruction under all circumstances for the entire semester in exchange for tuition. Plaintiffs also have not cited any evidence in the record demonstrating that MSU affirmed its promise and commitment to providing any particular type of service on campus in exchange for fees. Plaintiffs have not shown any evidence that MSU expressly manifested, in writing or orally, an intent to provide only in-person instruction or particular types of services on campus for the entire semester under all circumstances. *Bodnar*, 327 Mich App at 212; *McInerney*, 279 Mich at 46. There is no evidence that MSU ever offered to make such promises to plaintiffs, or any students. See *Kloian*, 273 Mich App at 453 ("An offer is defined as the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.") (quotation marks and citation omitted). Accordingly, there is no evidence of mutual assent. *Id*. at 452-454.

The record evidence shows that MSU reserved its right to make these changes. The MSU catalog states, "The University reserves the right to make changes in its programs, policies, rules, regulations, procedures, fees, tuition, housing rates, organizational structure, and faculty and staff through the appropriate University processes." Accordingly, no evidence supports the conclusion

that an express contract existed for a particular form of instruction or services in exchange for tuition and fees, as claimed by plaintiffs. *Kloian*, 273 Mich App at 452.

However, whether there were implied-in-fact contracts for in-person instruction and on-campus access to facilities and student services presents a somewhat closer question. As previously stated, an implied-in-fact contract arises when the circumstances, "according to the ordinary course of dealing and common understanding," demonstrate a "*mutual* intention to contract" that is "to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them, or other pertinent circumstances attending the transaction." *Erickson*, 384 Mich at 211-212 (emphasis added).

Plaintiffs assert that an implied-in-fact contract obligates MSU to provide in-person education and on-campus services in exchange for the tuition and fees paid. They ground this assertion in representations outlined in the MSU catalog and other informational materials, alongside MSU's established practice of delivering in-person education and campus experiences. Plaintiffs assert that both students and MSU operated under the fundamental assumption of a traditional college experience, and this understanding was central to their agreement to pay tuition and fees for education and on-campus services. Plaintiffs assert that, although MSU retained the right to modify programs and policies, no reasonable person would expect significant changes to impact something as fundamental as the shift from in-person instruction and services to an online format. To address this matter definitively, we must examine the relevant legal principles that clearly outline the rights and responsibilities between students and higher education institutions, especially given the unique nature of their relationship. A university's relationship with its students is crucial in these situations, as it determines what can be reasonably inferred when assessing the existence of an implied-in-fact contract. See *Erickson*, 384 Mich at 211-212. Furthermore, MSU argues explicitly on appeal that "Plaintiffs' implied contract theory failed under *Cuddihy v Wayne State Univ Bd of Governors*, 163 Mich App 153 (1987), which broadly rejected the proposition that student handbooks and the like may provide a basis such an implied or quasi-contract claim by a student against a university." As an initial matter, we do not understand this Court's decision in *Cuddihy* to stand for such a broad proposition.

In *Cuddihy*, plaintiff was a student dismissed from her academic program in May 1979 after failing many of her comprehensive examinations. *Cuddihy*, 163 Mich App at 154-155. In her lawsuit against the university, plaintiff advanced an implied contract or promissory estoppel argument and claimed that she had relied on a promise made by her academic adviser that she would complete the educational program by September 1978. *Id*. at 155-157. This Court held that the "statement made by plaintiff's academic adviser does not amount to an enforceable promise" because the "comment was merely an opinion." *Id*. at 157-158. The Court further reasoned:

> [I]t strains credulity to suggest that a student in a rigorous academic environment would "rely" on a "promise" by her academic adviser that she could graduate soon without also being cognizant that she must maintain her grades and pass her examinations. It is unlikely that a graduate student believed that merely by paying her tuition fees she was entitled to graduate with a masters degree. We conclude that plaintiff did not state a claim for promissory estoppel. [*Id*. at 158.]

-14-

This Court in *Cuddihy* clearly held that the statement attributed to the plaintiff's academic adviser did not constitute an enforceable promise. However, the opinion does not state that student handbooks, course catalogs, or other informational materials issued by a university can never create any type of contractual obligations.

The *Cuddihy* Court relied on *Regents of the Univ of Mich v Ewing*, 474 US 214; 106 S Ct 507; 88 L Ed 2d 523 (1985), in which a district court's ruling was left intact concluding that a pamphlet issued by the university had not given the plaintiff medical student a right to retake an examination on contract or estoppel grounds. *Cuddihy*, 163 Mich App at 157; see also *Ewing*, 474 US at 223-224 & nn 9-10. In the present case, MSU maintains that *Ewing* sets forth "a clear policy of judicial restraint and non-interference with the university-student academic relationship." The *Ewing* Court stated:

> When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment. [*Ewing*, 474 US at 225.]

This judicial deference was partly grounded in a concern for safeguarding the academic freedom of state and local educational institutions under the First Amendment. *Id*. at 226. The United States Supreme Court has recognized " 'four essential freedoms' of a university," *id*. at 226 n 12 (citations omitted), tracing its recognition back to Justice Frankfurter's concurring opinion in *Sweezy v New Hampshire*, 354 US 234; 77 S Ct 1203; 1 L Ed 2d 1311 (1957):

> It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail the four essential freedoms of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study. *Sweezy*, 354 US at 263 (Frankfurter, J., concurring in result) (quotation marks and citation omitted).

Additionally, our Supreme Court has stated that "when one is admitted to a college, there is an implied understanding that he shall not be arbitrarily dismissed therefrom." *Booker v Grand Rapids Med College*, 156 Mich 95, 99-100; 120 NW 589 (1909). The *Ewing* Court also conceded that a student may generally have an "implied contract right to continued enrollment free from arbitrary dismissal." *Ewing*, 474 US at 223.[6]

---

[6] As the United States Supreme Court recognized, *Booker* is "an antiquated race discrimination decision of the Michigan Supreme Court (whose principal holding has since been overtaken by events) . . . ." *Ewing*, 474 US at 223 n 7. Nonetheless, the United States Supreme Court seemed to agree that there still remained a general implied contractual right to continued enrollment without arbitrary dismissal from the university.

Here, plaintiffs argue on appeal that there was an implied-in-fact contract between the students and MSU, which stated that MSU would provide in-person educational instruction and on-campus student services in exchange for tuition and fees. Plaintiffs contend that this implied-in-fact contract was based on the conduct of the parties and "MSU's long-standing custom of in-person, face-to-face education on campus," along with the MSU course catalog, brochures, the online student portal, promotional materials, and advertisements. In these cases, there was record evidence that MSU expressly designated certain courses in its class schedule as "online" or "hybrid" (combining online with in-person instruction) and that traditional in-person classes included a designated meeting time and location for the class. The record also contains evidence of various MSU promotional materials explaining the types of facilities and experiences that students could expect to have access to both in and out of the classroom. Furthermore, there was evidence that course instructors were expected to meet with their classes at the designated scheduled times.

However, plaintiffs' argument on this issue ignores that MSU's catalog included a broad reservation of rights to amend these offerings. Therefore, even if we assume an implied-in-fact contract agreeing to exchange tuition for educational instruction and fees for various student activities, the reservation of rights language indicates there was no offer—and thus no meeting of the minds—on any specific format for delivering education and services. *Kloian*, 273 Mich App at 452-454; *McInerney*, 279 Mich at 49; *Erickson*, 384 Mich at 212. This conclusion decisively resolves this issue on appeal, as there is no evidence supporting the contractual terms plaintiffs claim were breached. MSU rightly received summary disposition regarding the plaintiffs' implied-in-fact contract claims for tuition and fees.

Turning to the unjust enrichment claims regarding tuition and fees, plaintiffs "must establish that the defendant received a benefit from the plaintiff[s] and that it would be inequitable for the defendant to keep the benefit." *Zwiker*, 340 Mich App at 482. Evidence presented to the trial court shows that MSU charged equal tuition for both in-person and online courses, and the funded organizations continued their operations and services for students. It is undeniable that courses were initially offered as in-person classes and that on-campus events were canceled due to an unexpected global crisis, the pandemic. Despite the pandemic, MSU successfully maintained the core of its educational mission—providing instruction and various services for students—throughout the pandemic. Furthermore, there was never an agreement stipulating that education and services had to be delivered in a specific format. Therefore, it is wholly fair and just for MSU to retain the tuition and fees it collected. *Id*.; see also *Dumas*, 437 Mich at 546 (opinion by RILEY, J.) (concluding that there was no unjust enrichment when an employer made changes to the compensation plan that were not prohibited by contractual agreement with the employees). MSU was entitled to summary disposition on these unjust enrichment claims.

## B. ROOM AND BOARD

Next, Allen argues that the trial court erred by dismissing his breach of contract claim based on room and board.

"In interpreting a contract, our obligation is to determine the intent of the contracting parties. If the language of the contract is unambiguous, we construe and enforce the contract as

-16-

written." *Quality Products & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003) (citation omitted).

The record contains a copy of the written student housing and dining services contract and the On-Campus Housing Handbook that was expressly incorporated in the written contract. The housing and dining contract stated that it was "binding" on the student for "the entire academic year." There was a "Contract Buyout" clause in the contract stating:

> If more than 14 days have passed since you signed your housing contract or if you have moved into your residence hall or apartment, you may obtain relief from the obligations of your housing contract upon payment of 60 percent of the remaining room and board fees for the remaining portion of the contract term. You should notify the Housing Assignment Office in writing of your intent to exercise the buyout, but you will continue to be responsible for the full amount of the room and board charges until you have properly checked out of your residence hall or apartment community. The buyout option is not available the last two weeks of the spring semester.

Additionally, the handbook that was incorporated into the contract stated:

> Michigan State University may terminate or temporarily suspend the Contract or any part of it, without notice, in case of an emergency that would make continued operation of resident housing impossible. Michigan State University may also terminate or temporarily suspend this Contract for renovation, maintenance and construction projects.

Here, the record indicates that MSU encouraged students living on campus to return to their permanent residences if possible. MSU also informed students that they could remain in on-campus housing if MSU was the student's permanent residence or if leaving was not possible. MSU also offered a $1,120 credit to students who chose to move out of on-campus housing. Allen admitted that he moved out of on-campus housing in March 2020 and appeared to concede that he received the $1,120 credit. MSU stated below that this credit was consistent with what a student could obtain under the buyout provision of the contract, and the defendant does not dispute this contention.

A breach occurs if a party does not perform a contractual duty due under the contract's terms. *Woody v Tamer*, 158 Mich App 764, 771-772; 405 NW2d 213 (1987), citing Restatement Contracts, 2d, § 235. Here, Allen has not identified any promise that MSU made in the contract that it did not perform. Although Allen asserts that he is entitled to a full prorated refund for the remainder of the semester during which he did not live on campus, instead of the partial refund he received, no contractual language gives Allen an enforceable right to what he claims. Thus, there is no question of material fact that there was no breach of the contract. *Id.*; *Miller-Davis Co*, 495 Mich at 178. MSU was entitled to summary disposition on this breach-of-contract claim. MSU was also entitled to summary disposition on the unjust enrichment claim related to room and board because "[c]ourts may not imply a contract under an unjust-enrichment theory if there is an express agreement covering the same subject matter." *Zwiker*, 340 Mich App at 482.

-17-

## C. CONVERSION

The Olin and Placko plaintiffs argue that the trial court erred by granting summary disposition on their conversion claims.

"Under the common law, conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc*, 497 Mich 337, 346; 871 NW2d 136 (2015). "Money is treated as personal property, and an action may lie in conversion of money provided that 'there is an obligation to keep intact or deliver the specific money in question, and where such money can be identified.' " *Dunn v Bennett*, 303 Mich App 767, 778; 846 NW2d 75 (2013), quoting *Garras v Bekiares*, 315 Mich 141, 149; 23 NW2d 239 (1946). The money must be "identical money or checks," not merely a payment. *Garras*, 315 Mich at 148 (quotation marks and citation omitted). In this case, neither the Olins nor the Plackos asserted that MSU was obligated to deliver a specific money or check; rather, both alleged that MSU had wrongfully retained payments. This is insufficient to state a claim for conversion. The trial court did not err by granting MSU summary disposition on the conversion claims.

## D. MONEY HAD AND RECEIVED

The Olins argue that the trial court erred in granting summary disposition of their claim for money they had and received for tuition and fees.

An action for money had and received is an action of assumpsit. *Youmans v Bloomfield Charter Twp*, 336 Mich App 161, 213; 969 NW2d 570 (2021). Assumpsit has been abolished as a cause of action, and assumpsit claims are simply a subset of unjust-enrichment claims. *Id*. The Olins' claim for money had and received is merely duplicative of their tuition-and-fee-based unjust enrichment claim. Summary disposition of this claim was thus also proper for the same reasons.

## E. MISCELLANEOUS ISSUES

Plaintiffs assert they were wrongfully denied the opportunity to conduct discovery, yet they fail to specify what evidence they could have uncovered. They imply that discovery might lead to the unearthing of the contracts underlying their claims. However, mutual assent and a meeting of the minds are crucial to forming a contract. Thus, plaintiffs must demonstrate their status as parties to these alleged contractual agreements by explaining their basis for belief and detailing the evidence sought to prove the existence of those contracts, even if they no longer have copies of documents. Instead, plaintiffs have only declared the existence of contracts and demanded that MSU search for and produce contracts meeting their criteria, all while MSU contends that such contracts never existed. This approach directly contradicts the established rule that plaintiffs bear the burden of proving the existence of the contract terms they intend to enforce. *AFT Mich*, 497 Mich at 235. Plaintiffs have not demonstrated that further discovery "stands a fair chance of uncovering factual support for the opposing party's position." *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 292; 769 NW2d 234 (2009). A "party opposing summary disposition cannot simply state that summary disposition is premature without identifying a disputed issue and supporting that issue with independent evidence." *Id*.

For the same reasons, and because they have not alleged the existence of any evidence that would create a genuine issue of material fact regarding their claims and prohibit summary disposition in MSU's favor, any error that plaintiffs allege occurred in the trial court's treatment of (C)(8) motions as (C)(10) motions was harmless.[7]  MCR 2.613(A).

We reject plaintiffs' argument that the frustration of purpose doctrine applies and entitles them to restitution.  "Frustration of purpose is generally asserted where 'a change in circumstances makes one party's performance virtually worthless to the other, frustrating his purpose in making the contract.' "  *Liggett Rest Group, Inc v City of Pontiac*, 260 Mich App 127, 133-134; 676 NW2d 633 (2003), quoting Restatement Contracts, 2d, § 265, comment a.  According to the Restatement,

> the purpose that is frustrated must have been a principal purpose of that party in making the contract.  It is not enough that he had in mind some specific object without which he would not have made the contract.  The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense.  [Restatement Contracts, 2d, § 265, comment a.]

In light of our analysis in the preceding parts of this opinion, the principal purpose of the contracts—a college education—was not rendered virtually worthless, thereby constituting a frustration of purpose.  *Liggett Restaurant Group*, 260 Mich app at 133-134.

Finally, plaintiffs argue that the trial court abused its discretion by denying plaintiffs' motion to amend their complaint.  This Court reviews for an abuse of discretion a trial court's denial of a motion to amend a complaint.  *Zwiker*, 340 Mich App at 474.  The trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes.  *Id*.

A party may move to amend the pleadings after the trial court grants summary disposition under MCR 2.116(C)(10) "unless the evidence then before the court shows that amendment would not be justified."  MCR 2.116(I)(5).  "Leave shall be freely given when justice so requires."  MCR 2.118(A)(2).  However, the trial court may deny the motion if the amendment would be futile. *Zwiker*, 340 Mich App at 484.  A proposed amendment is futile when "summary disposition would be appropriately granted regarding the new claims, either when a party has not established a genuine issue of material fact regarding an element . . . or when the undisputed facts establish that summary disposition would be appropriate . . . ."  *Id*.

Here, the trial court denied plaintiffs' motion to amend their complaint on the ground of futility.  The court explained:

> With respect to the attempts to revive the breach-of-contract and unjust enrichment claims that were previously dismissed, the Court concludes that the proposed amendments would be futile.  In adhering to the law set forth in prior opinions of this Court, it is clear that none of the "new" documents submitted with the proposed

---

[7] Because it is not necessary to make such a finding, we express no opinion on whether an error actually occurred.

amended complaint allow for the proposed amendments. In other words, they are futile. Neither the Statement of Financial Responsibility, nor any of the other documents attached to the proposed amended complaint, contain express or implied promises supporting the proposed allegations. Nor do any of the proposed new allegations overcome the law previously relied upon in addressing these claims.

Based on our review of plaintiffs' motion, the trial court's ruling was not outside the range of reasoned and principled outcomes. *Id*. at 474, 484. The trial court did not abuse its discretion by denying the motion to amend. *Id*.

To the extent our reasoning on any of the above issues in this opinion differs from that of the trial court, "[w]e will affirm a trial court's decision on a motion for summary disposition if it reached the correct result, even if our reasoning differs." *Kyocera Corp v Hemlock Semiconductor, LLC*, 313 Mich App 437, 449; 886 NW2d 445 (2015).

Affirmed. Defendants having prevailed in full are entitled to tax costs. MCR 7.219(A).

/s/ Stephen L. Borrello
/s/ Noah P. Hood
/s/ Adrienne N. Young